**WARNICKE & LITTLER, P.L.C.**
1411 N. Third Street
Phoenix, Arizona 85004
TELEPHONE (602) 256-0400
FAX (602) 256-0345
E-MAIL: administrator@warnickelittler.com

Thomas E. Littler/SBN 006917
Robert C. Warnicke/SBN 015345
Attorneys for Rock Bottom, LLC

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In proceedings Under Chapter 11 |
| **U. S. AMERICAN STONE AND MINERALS, INC.** | Case No. 2:07-bk-01628-GBN |
| **Debtor.** | **MOTION TO CONVERT CASE TO CHAPTER 7** |

Rock Bottom, LLC ("Rock Bottom"), a secured creditor in the above captioned Chapter 11 case of U.S. American Stone and Minerals, Inc. (the "Debtor") respectfully request the court enter an Order converting this case to a case under Chapter 7 for causes:

(i)     Debtor's activities are causing a substantial and continuing loss and diminution of the estate;

(ii)    There is no likelihood of rehabilitation of this Debtor;

(iii)   Debtor has grossly mismanaged this case and its business

(iv)    Debtor has failed to timely present and confirm a plan of reorganization and has no reasonable likelihood of getting a plan confirmed or rehabilitation.

This Motion is supported by the following Memorandum of Facts and Authorities which is incorporated herein by this reference, and the entire record before the Court.

RESPECTFULLY SUBMITTED this _20_ day of January, 2010.

WARNICKE & LITTLER P.L.C.

By _____
    Thomas E. Littler
    Robert C. Warnicke
    1411 N. Third Street
    Phoenix, Arizona 85004
    Attorneys for Defendant Rock Bottom,
    LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This is a single asset Chapter 11 case sitting fallow for almost three years. Debtor's only real estate is in foreclosure. Debtor has no business operations. Debtor is not paying its expenses, its administrative expenses, or its real estate taxes and they are accruing. Debtor was never even licensed to do business in Arizona. Debtor has failed to close a loan approved by the Court on an emergency basis months ago. Debtor's only "business" is suing its DIP lender and related parties and incurring attorneys fees. In three years the sum total of Debtor's progress toward reorganization was a plan Debtor withdrew after the purported lender signed an affidavit stating that his signature on the loan commitment had been forged. Yet Debtor, which had its sole asset transferred to it right before bankruptcy and then shuttered its doors almost immediately after filing for relief, continues to incur administrative fees, and continues to avoid prosecuting potential preference actions, managing only to fight Rock Bottom whose sole offense was providing monies to pay off the Debtor's lender and avoid foreclosure and then wanted to get repaid as promised.

Debtor has no plan on file and has no resources to rehabilitate its business and pay its debts. Indeed, the Debtor can not even pay Rock Bottom, its DIP lender which saved the Debtor's only asset from foreclosure, and the Debtor's only asset is in foreclosure again with no prospect of saving it. Moreover, Debtor admits in filings in this Court that the amount owing to Rock Bottom is more than the value of the property securing the debt.

Given the Debtor's track record, there is no credible reason to keep this case in Chapter 11. Based on costs incurred by the Debtor's attorneys alone this estate is administratively

insolvent in Chapter 11, and will only become more deeply insolvent with the continued accrual of fees and interest on the DIP loan. In short, the Debtor is doing nothing that debtors in reorganization proceedings are supposed to do to reorganize and the facts reveal clearly that nothing can be done to rehabilitate this Debtor. Given the simple and straightforward nature of this case, and based on the totality of the circumstances, cause exists to convert this proceeding to Chapter 7.

## FACTUAL AND PROCEDURAL BACKGROUND

The Debtor filed its voluntary Chapter 11 petition nearly three years ago on February 27, 2007 (the "Petition Date"). The Debtor remains in possession of its assets and properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed.

The Debtor purportedly operated an aggregate mining operation at the Old Congress Mine in Congress, AZ. It is doubtful, however, that the Debtor ever really conducted any mining operations itself. The Debtor did not even own the mining claims it lists in its Schedules until the day before the Debtor filed bankruptcy and its statement of financial affairs provide that the Debtor did not make any payments of $5,000 or more to vendors or other parties within 90 days of filing bankruptcy revealing a lack of business operations. Instead, it appears the Debtor's parent – U.S. American Resources, Inc. ("USAR") - was removing and processing its primary asset--certain mining claims in the Congress Mine (the "Vineyard Tract")--on February 27, 2007; the same day the Debtor filed its Chapter 11 petition.

USAR purchased the Vineyard Mine Claims from Vineyard Office Plaza, L.L.C. ("Vineyard") in August 2006. USAR financed the purchase through a carry-back note to

Vineyard secured by a deed of trust against the Vineyard Tract. USAR defaulted on the note and Vineyard initiated a trustee's sale of the Vineyard Tract set for February 28, 2007. The two days before the trustee's sale, on February 26th, USAR deeded the Vineyard Tract to the Debtor, and then filed its Chapter 11 petition on February 27th.

Since shortly after the filing the Debtor ceased any operations and has not operated any business operations that have generated any revenue whatsoever. At the same time, the Debtor has incurred over $250,000 in attorney's fees and costs paid in part from monies from third parties. The only asset listed on the Debtor's balance sheet and in the interim reports is the real estate with a value of $500,000. The Debtor admits that it owes Rock Bottom more than that. The Debtor stipulated with Rock Bottom to the entry of an Order to the Court which states the *undisputed amount* owed is $717,246.90. ***See.*** Order entered September 21, 2009 (DE 445)(the disputed amount is even more and growing). Now, the Debtor, with no ongoing business operations is facing the loss of its only real asset that could generate revenue to foreclosure and will be left with questionable litigation claims that is costing the estate money it does not have and can not generate.

The Debtor has no plan on file that it is prosecuting towards confirmation. Its only real estate asset is in foreclosure. It can't fund the court approved loan. We can fathom no reason for this case to remain in Chapter 11.

### ARGUMENT

Pursuant to Bankruptcy Code § 1112(b), on request of a party in interest after notice and a hearing, the Court may for cause convert a case under Chapter 11 to a case under Chapter 7, or may dismiss a case under Chapter 11, whichever is in the best interests of creditors. *See* 11

U.S.C. §1112(b). As a secured creditor, Rock Bottom is a party in interest within the meaning of Bankruptcy Code §1112(b), and therefore is entitled to move to convert this Chapter 11 case.

Bankruptcy Code §1112(b)(4) enumerates number of "causes" for conversion or dismissal, including:

> (A)     Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation
>
> (B) Gross mismanagement of the estate
>
> (F) Unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this Chapter
>
> (H) Failure to file a disclosure statement or to file or confirm a plan within the time fixed by this title or by order of the court

The list enumerated in §1112(b), however, is not exhaustive. *In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir. 1990); *In re Hall*, 887 F.2d 1041, 1044 (10th Cir. 1989). Under any of the causes listed above, whether considered individually, or in totality, Debtor's case should be converted to Chapter 7.

**1.    Cause Exists Pursuant To § 1112(B)(4)(A) Because The Estate Is Being Diminished And There Is No Likelihood Of Rehabilitation**

In order to demonstrate cause under § 1112(b)(4)(A), the movant must demonstrate that Debtor has no likelihood of rehabilitation and diminishment of the estate. 7 *Collier on Bankruptcy* § 1112.04[5] [a] (15th ed. 2008). Debtor fails to overcome either hurdle.

**A.    The Estate is Non-operational and the Estate is being Diminished**

**1.    Debtor has No Operations and No Income**

Whether Debtor (as opposed to its parent USAR) ever operated a business at the Vineyard Tract is questionable at best. Indisputable, however, is that Debtor shut down whatever business it claimed to operate almost immediately after filing its February 27, 2007 petition for relief. Per John Owen, the Debtor 's Director and the sole shareholder of the Debtor's parent, the company stopped operating less than a month later, around the first or second week of March 2007. *Exhibit 1, Deposition of John Owen*, at 124. Debtor's former CEO agrees, stating that the Debtor ceased operating between February and April when it ran out of money and "the company was basically out of business." *Exhibit 2, Deposition of Robert Palmer*, at 20, 47, 52. The monthly operating reports bear out Debtor's cessation of all operations. After claiming a purported $135,147.72 in income for April 2007, Debtor has not reported a single penny of income in any month thereafter. Notably, neither the Debtor nor USAR was ever licensed to do business in Arizona. *Exhibit 3, Arizona Corporation Commission Search Results.*

## 2. Debtor is doing Nothing but Incurring Administrative Expenses

Despite having no revenues since April 2009, no plan on file, no prospect of a plan, and a lone real estate asset that is rapidly losing value in today's economy and is being foreclosed, Debtor has nevertheless proven adept at incurring administrative expenses in the form of attorneys' fees, thereby further diminishing the Estate. *In re Schriock Constr., Inc.,* 167 B.R. 569, 575 (Bankr.D.N.D. 1994) (diminution of the estate is demonstrated by proving that the debtor has incurred losses or maintained a negative cash flow position after the entry of the order for relief); *In re Citi-Toledo Partners,* 170 B.R.602 (Bankr.N.D. Ohio 1994) (accruing administrative expenses may diminish estate).

Debtor's initial local counsel, Dan Collins, filed his application for $24,803 in fees and costs on August 29, 2007. (DE 76). Those fees and costs were allowed. (DE 119). On October 5, 2007, Joyce Lindauer, Debtor's Texas counsel, likewise filed an application as debtor's attorney for $43,846.16 in fees and costs. (DE). Ms. Lindauer continued to represent Debtor in these proceedings until recently and will undoubtedly have continued to incur substantial fees and costs for which she will make claim against the Estate. Debtor has also hired Snell & Wilmer to serve as local counsel and now the sole counsel. Snell & Wilmer LLP was approved for fees in the amount of $234,718.50 and costs of $13,970.84 (DE 442). Its application for those fees was dated June 22, 2009. (DE 391) The period the fees were approved for was September 1, 2008 through March 31, 2009. Snell & Wilmer LLP has undoubtedly continued to incur substantial fees in this case since then and no additional retainer has been reported since March 5, 2009. According to the Snell & Wilmer disclosures, it has little monies left in its retainer to cover such fees.

In short, the estate is administratively insolvent, as it continues to accrue attorneys' fees that are not being offset by any income or appreciation in asset values. ***Loop Corp. v. United States Tr.***, 379 F.3d 511, 516 (8th Cir. Minn. 2004) (where debtor has ceased business operations and liquidated most assets, any negative cash flow-including that resulting from administrative expenses, comes from the creditor's pockets, and satisfies the diminution of the estate prong). Nor is it apparent what value the estate has gained from their expenditure. Debtor has yet to investigate a single potential preference action and there is no plan on file.

### B. Debtor has No Prospect of Rehabilitation

This element "is not the technical one of whether the debtor can confirm a plan, but, rather whether the debtor's business prospects justify continuance of the reorganization effort." *In re Original IFPC S'holders, Inc.*, 317 B.R. 738, 742 (Bankr.N.D. Ill. 2004). Nevertheless, the United States Supreme Court "has long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate ... *within a limited period.*' **"Katchen v. Landy**, 382 U.S. 323, 328-29, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (*quoting Ex Parte Christy*, 44 U.S. 292, 312, 3 How. 292, 11 L. Ed. 603 (1845) (emphasis supplied). Debtor's 24 month long foray into Chapter 11 has been anything but prompt and effectual. And while § 1112(b)(4)(1) is concerned with "rehabilitation" not necessarily reorganization, if the Court needs any evidence that the Debtor has no prospect of rehabilitation, it need only look to the Debtor's glaring lack of activity regarding reorganization.

On August 21, 2007, the Debtor submitted its "First Plan of Reorganization Dated August 21, 2007" (DE 73) but never filed a disclosure statement and never pursued confirmation. Then, on September 27, 2007, the Debtor filed its "Second Plan of Reorganization Dated September 17, 2007" (DE 91), together with the Debtor's "Disclosure Statement" (DE 90). That plan was premised on an "investment of funds from third party funding." *See*, "Disclosure Statement", at 25. As evidence of that loan, Debtor submitted to the Court a $1.5 million "financing commitment" from Worldwide Financial Resources ("Worldwide") that was purportedly signed by Mr. Robert Waisman on behalf of Worldwide. *See* Disclosure Statement, Exhibit 7.

There was, however, no loan commitment. Mr. Waisman quickly submitted a declaration stating, among other things, that the loan commitment Debtor had attached was not valid, that Worldwide is not a commercial lender, that he is not authorized to enter into loan commitments on behalf of Worldwide, and most importantly, *that he never signed any loan commitment*. *See*, "Objection to Debtor's Disclosure Statement", Ex. 1. (DE 143). After Mr. Waisman's declaration that Debtor had forged the loan commitment, and after Mr. Waisman could not be located for a deposition, Debtor withdrew its plan on November 2, 2007. (DE 172).

In August of 2009, Debtor submitted a third emergency motion for financing. This time the Debtor claimed that there was a replacement lender who would *immediately* loan $3 million dollars to the Debtor. *See*, "Debtor's Third Motion Emergency Motion for Entry of A Final Order Approving Motion for Replacement Financing and Granting Replacement Lender Liens and Security Interests in Real and Personal Property; and an Administrative Priority Claim", at Page 3. (DE 405)    The Debtor described that the replacement lender intended to set up a financing arrangement in the $20 million dollar range to permit the Debtor to restart its operations. The Debtor also represented that the replacement lender had "$140 million dollars in immediate available funds on deposit in a bank in Dallas, Texas." *Id.*, at Page 8.   Despite numerous assurances at continued hearings on the emergency motion since last August that the loan would close at the end of the week, end of the month, or just *soon*, as this Court knows, the Debtor has not closed the loan in these long months since the emergency motion was filed.

Thus, the sum of a reorganization total of the reorganization effort is two withdrawn plans and two failed attempts to obtain post-petition financing to take out the post petition financing by Rock Bottom; this is reason enough to convert the case. *See Illum Hansen, Inc.*

-- Page 10

*v. Tiana Queen Motel, Inc. (In re Tiana Queen Motel, Inc.*, 749 F .2d 146, 151-52 (2nd Cir.1984) (debtor's failure to "devise a reorganization plan grounded in reality" within 15 months of petition warranted conversion) *cert. denied*, 471 U.S. 1138, 105 S.Ct. 2681, 86 L.Ed.2d 699 (1985).

Not that the apathy is surprising. A variety of factors demonstrate that this Debtor has no prospect of rehabilitation and nothing to justify continuance to wait for some new plan of reorganization to be proposed. *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) ("the very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless"); *In re Johnston*, 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992) ("where there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case"). This case should be converted.

## 1. The Property Lacks Access

No matter what commercial use Debtor wants to make of the Vineyard Claims, it needs legal access to the property. One problem: there is no access. Expert Michael Anable found that there are no easements, private rights of access, or any other legal, insurable, rights of access across that government land, to the Vineyard Tract.[1] After examining land dispositions on the land surrounding the Vineyard Tract on the computerized title records at the Arizona State Land Department and the US Bureau of Land Management databases, Mr. Anable concluded that there is currently no legal access to the claims that constitute the Vineyard Tract. *Exhibit 4 Deposition of Michael Anable, page 15: Exhibit 1, Report, thereto at page 1).*

---

[1] Mr. Anable spent six years as the Arizona State Land Commissioner and Deputy State Land Commissioner, before entering private consulting practice

If that weren't enough, access to one Vineyard Tract claim or parcel does not guarantee access to the claims on other parcels – the Vineyard mine claims are not contiguous. Rather, they are separated by a mining claim that is *not* owed by the Debtor: the "Why Not" mining claim. The "Why Not" claim is one of the Surgent mine claims, which are owned by Rock Bottom.[2]   As Debtor admits, the Vineyard Tract does not include any access rights over the "Why Not" claim and Rock Bottom will not grant access to the Debtor.  *See*, Debtor's "Disclosure Statement", at 17 (DE 90). Consequently, Debtor currently has no legal access to the claims on the Vineyard Tract, and even it had access to one claim, it still would not necessarily have access to the claims on other parcels.

## 2.     The Vineyard Claims have Serious Title Issues

Debtor's lack of legal access creates title problems, because a title company will exempt legal access from coverage. Debtor admits as much, recognizing its current "commitment states that the Vineyard Mine Claims do not have legally insurable access to and from a public street." See Debtor's "Disclosure Statement", at 17 (DE 90); *See also*, *Exhibit 4 Deposition of Michael Anable, page 15: Exhibit 1, Report, thereto at page1)*. The lack of insurable access alone will make it difficult to obtain funding from a reputable source which will likely insist on a proper title insurance policy. Lack of access, however, isn't the only title issue.

Per the Debtor's "Disclosure Statement", other title issues include (a) the Debtor's title to the Vineyard mine claims maybe limited to the surface of the property to the depth of 40 feet; (b) Debtor's title to the subsurface below 40 feet may be held by other property owners; (c) the subsurface owners may own portions of the surface estate and have access rights over

---

[2] Rock Bottom purchased the Surgent Tract free and clear of all claims from the Surgent Texas

the surface of the Vineyard mine claims; (d) royalty reservations held by other parties; and (e) the Vineyard mine claims may be subject to a pre-petition purchase option. *See*, Debtor's "Disclosure Statement", at 16 (DE 90).

### 3. Debtor Needs Property it Does not Own to Operate

Debtor cannot run a successful enterprise with the assets it currently owns. Per Debtor's Director, John Owen, Debtor "would have to get [the Surgent Claims] to operate the mine." *Exhibit 1 Deposition of John Owen at 53-54*. Putting the various Surgent and Vineyard tracts back together again, to create one "whole piece" is "necessary to operate the property to the best extent." *Exhibit 1 Deposition of John Owen, at 54, 55*. Debtor's former CEO, Robert Palmer, agrees, stating that it is necessary for Debtor to own the Surgent Claims in order to operate a "successful and efficient" aggregate operation. *Exhibit 2, Deposition of Robert Palmer, at 52*. Rock Bottom, however, owns the Surgent Claims, and has no intention of selling them to Debtor under the current circumstances. The only chance the Debtor has to recover the Surgent Tract is by success in the adversary complaint; a complaint the Debtor can not afford to prosecute, even if it had any merit, and is in its early stages. In addition, even if successful in its claims against the Surgent Tract, it has no money to save the Vineyard Tract which it owns, much less pay for the Surgent Tract.[3]

### 4. Debtor's Sole Asset is Over Encumbered and is Set for a Trustee's sale

Rock Bottom is a secured creditor of the Debtor "by virtue Stipulated Order Authorizing Post Petition Loan and Granting Lender Liens and Security Interests in Real Property"

---

Bankruptcy.

[3] There is no realistic scenario where the success of the claims in the adversary could lead to obtaining

("Stipulated Order) (DE 51), granting Rock Bottom a first-position lien on the Vineyard Tract on June 22, 2007 as well as the Debtor's belated execution of security documents that was compelled by this Court Order on November 11, 2009 (DE 463). The Stipulated Order authorized the Debtor to borrow $555,333.89 from Rock Bottom to pay off the Vineyard debt, granted Rock Bottom an Allowed Claim in the Chapter 11 case in that amount, and further granted Rock Bottom a first-priority lien on the Vineyard Tract to secure the post petition financing claim.

As Debtor's schedules and operating reports attest, the Vineyard Tract is Debtor's only asset. And per Debtor's monthly operating reports, the Vineyard Tract and its various mining claims are worth $550,000.00. *See*, September 2007 Operating Report, at 5. Given that Rock Bottom, has an undisputed secured interest in the amount of $717,246.90 and another at least $883,000.00 at dispute, there is no question that the property is worth less than the debt. Indeed, this Court granted Rock Bottom's Motion for Stay Relief in this matter on November 11, 2009, granting stay relief as of November 23, 2009 at 5:00 p.m. (DE 462). A trustee's sale for the Vineyard Tract is scheduled for March 24, 2010 at 10 a.m.

### 5. The Debtor Need More Funds than to Just Pay Rock Bottom

In order to successfully reorganize, the Debtor needs a lot more than the money necessary to unencumber its lone assets. For one, Debtor, which purports to operate a mining company, has no mining equipment. It would first have to re-acquire this equipment, to "start from scratch, basically" according to its former CEO, prior to starting up operations. *Exhibit 2 Deposition of Robert Palmer, at 59*. The cost of reacquiring that equipment? More than $3 million dollars, an amount well beyond anything Debtor has previously attempted to obtain,

the Surgent Tract for free.
-- Page 14

even ignoring that Debtor's has yet to successfully infuse any cash into the Debtor. *Exhibit 2, Deposition of Robert Palmer at 59, 60.*[4]

The $3 million dollar estimate only covers the equipment Debtor might need. It does not include any of the other assets necessary to operate a successful mining operation. Nor does it include the various costs Debtor would have to incur before putting any of that non-existent equipment to use. For example, and as detailed in the Court approved "Disclosure Statement" for Rock Bottom's Plan, the Vineyard Tract may be subject to significant environmental liabilities resulting from the historical use of cyanide and other hazardous substances in past gold mining operations. Indeed, the Debtor's own environmental consultant in 2006 estimated that the cost of remediating the environmental conditions at the site of the Old Congress Mine could top $5 million. *See* Rock Bottom's "Disclosure Statement", at 23-26 (DE 80). The Debtor's third emergency motion for financing gives an indication about just how much money is really needed: the Debtor's motion discusses a $20 million dollar financing facility. See, "Debtor's Third Motion Emergency Motion for Entry of A Final Order Approving Motion for Replacement Financing and Granting Replacement Lender Liens and Security Interests in Real and Personal Property; and an Administrative Priority Claim", at Page 8. (DE 405). There is no reasonable prospect for this Debtor to raise that kind of money.

Debtor also would need to hire attorneys and/or consultants to (a) obtain legal access to the property or a haul for the aggregate, (b) obtain a permit from the State Mine Inspector to conduct mining operations, and (c) obtain any other environmental permits that might be

---

[4] Even if Debtor could simply rent the equipment, rather than purchasing it, the costs would be high. Debtor purportedly owes USAR and International Energy Resources more than $1.8 million for equipment rentals.
Claims Nos. 9 and 10 on claims register for case no. 07-01628

-- Page 15

necessary, not to mention hire employees, locate buyers for the aggregate, clear up title issues, and otherwise find the cash necessary to resurrect a long dormant company. Debtor has shown no ability to do any of this, and its ability to raise funds given the title issues, not to mention Debtor's admitted need to acquire property that is not for sale, is highly doubtful. Undoubtedly, the Debtor will argue that it already has a loan approved by the Court that will provide these funds. Notably, the loan has not closed despite repeated promises, is unlikely to close, and funds would be needed well beyond the approved amount anyway.

### 6.    There is no Gold Value in the Property

Debtor has routinely made unsubstantiated claims that it owns gold tailings that can be reprocessed for gold. *See*, "Debtor's Objections to Amended Disclosure Statement of Rock Bottom, L.L.C.") at p.7 (DE 165).   To the contrary, any attempts to mine these tailings, even if they belonged to the Debtor, would result in a loss.  As testified to by Peter Lenton, [5] there are no economically feasible means to extract whatever gold remains in those tailings. *Exhibit 5, Deposition of Peter Lenton at 41-42*.  This testimony supports Mr. Lenton's expert report. *Exhibit 5, Deposition of Peter Lenton at 13; Exhibit 1*.   Reprocessing and smelting are the only two modern means of extracting whatever gold remains. *Exhibit 5, Deposition of Peter Lenton at 13; Exhibit 1*.  Yet, reprocessing the gold tailings on site would lead to an estimated $9.8 million loss, while hauling and then smelting the gold tailings projects to an estimated $48.3 million loss. *Exhibit 5, Deposition of Peter Lenton at 13; Exhibit 1, at, and 5-6*.

In short, Debtor has no employees, no equipment, no income, no legal means of access, no gold, no right to the Surgent Tract it admits are necessary, and has not demonstrated any resolve, let alone ability, to reorganize. At worst, during its attempt at reorganization, John

-- Page 16

Owen, on behalf of the Debtor, submitted a forged loan commitment to this Court. At best, the Debtor's plan was premised on a funding source so unwilling and unreliable, that he was willing to perjure himself. Those factors all point to a Debtor beyond rehabilitation.

This Chapter 11 case has dragged on long enough. Cause exists to convert pursuant to § 1112(b) (4) (A).

### 2. Cause Exists Pursuant To § 1112(B) (4) (B) Because The Estate Is Being Grossly Mismanaged

Debtor, as a debtor-in-possession, has a duty to its creditors to maximize the estate, keep the business going, and reorganize. Yet Debtor, as detailed above, has done nothing on its own accord to move this case forward. There has been no actual plan of reorganization put forth since September 17, 2007 (DE 91), and no viable plan put forth at any time. Instead, Debtor has spent hundreds of thousands of dollars fighting Rock Bottom's First Amended Plan of Reorganization (DE 146), fighting Rock Bottom on giving it the long overdue note and security documents, and litigating a spurious adversary proceeding. This is money which would have at the very least, guaranteed full payment to the administrative and priority unsecured creditors, with a least some money pledged for unsecured creditors. Debtor refusal to reorganize, however, has not been its only means of gross mismanagement.

### A. Debtor's Candor to the Tribunal Has Been Questionable

Debtor failed to inform the Court (and the estate's creditors) that as part of its attempt to pay off Rock Bottom, John Owen offered a working interest in property belonging to the Debtor. On December 5, 2007, Debtor filed its "<u>Second Emergency Motion for Entry of a Final Order Approving Motion for Replacement Post Petition Financing; and Granting Replacement</u>

---

[5] Footnote to qualifications?

-- Page 17

Lender Liens and Security Interests in Real and Personal Property; and an Administrative Priority Claim", seeking to pay off Rock Bottom (DE 184). Bud Klein, a potential investor, was to be the major source of the funds, as evidenced by a term sheet for $1 million to be accrued by the Vineyard Claims. *Id*, Exhibit. A thereto.

That term sheet, however, did not represent the entire deal struck with Mr. Klein by John Owen, for DIP financing for Debtor. In fact, there was already a fully executed "Loan Agreement" between USAR and Mr. Klein, by which USAR would grant Mr. Klein a "1% Working Interest in each of the following Mines to which USAR has mining rights: Aruba; Columbia; Congress; Golconda; Little Giant; Rex Curtis; and San Marcos."[6] The Congress Mine, of course, includes the Vineyard Tract, which are part of the estate.

Mr. Klein testified that the "working interest," a right to profit out of the Congress Mine's production, was part of the agreement struck with Mr. Owen if the court agreed to the replacement financing. *Exhibit 6 Deposition of Bud Klein, at 29-31*. John Owen also admitted that this working interest was part of the consideration securing Mr. Klein's participation. *Exhibit 1 Deposition of John Own, at 101-103*. **Yet this Loan Agreement, an essential part of the deal that purported to grant a third party lender a working interest in property of the estate, was never disclosed to the court or to creditors**, and constitutes mismanagement.

Debtor had likewise taken license with its administrative wage claims, thereby further mismanaging the estate. Debtor filed for bankruptcy on February 27, 2007. As detailed above, Debtor continued to operate the mine for at most another two months. By May of 2007,

---

[6] Bud Klein was not the only investor from whom Debtor would obtain funds to pay off Rock Bottom. Beverly and Ronald O'Connor also signed term sheets for $300,000 in funds. Those term sheets were disclosed to the Court. In keeping with practice, Loan Agreements that were also signed by Beverly and Ronald O'Connor, and that also pledged to them a working interest in mines, including the Congress

Debtor's income was zero and Debtor hasn't reported any income since. (May 2007 Opening Report). Yet despite shuttering its business in short order, Debtor saw fit to file administrative expense claims for James Somma, Robert Palmer, and David Clark for $75,000 each in wages, and for Neil Teague for $26,000 in wages. It is inexplicable how those four individuals could claim a right to a mysteriously round $251,000 wage figure, in the few short weeks that the company continued to operate. In fact, Mr. Palmer purportedly earned that $75,000 despite his testimony that he quit as CEO in April 2007. *Exhibit 2 Deposition of Robert Palmer Deposition, at 20.*[7]

## B.    Debtor has not Investigated any Preference Actions

Debtor has also done nothing to increase the estate's assets for the benefit of creditors by investigating or bringing a single avoidance action. Certainly there are claims worth investigating against Debtor's parent, USAR. For example, USAR and the Gerald Blank Trust (the "Blank Trust") entered into an accounts receivable factoring agreement. *See* Exhibit A to "Limited Objection to Motion to Extend Use of Cast Collateral" [DE 25] filed by the Blank Trust on May 3, 2005. It appears, however, that the accounts receivables sold by USAR to the Blank Trust were purportedly generated by the Debtor- not USAR. *Id.,* Exhibits B and C. The Blank Trust has alleged that after the petition date, USAR instructed the Blank Trust to make payments on the factored accounts to USAR-not the Debtor. "Amended Complaint" in adversary 07-00293-GBN, ¶ 23. If the Debtor's invoices were in fact sold to the Blank Trust

---

Mine, were never disclosed to the Court by Debtor. (Cite to O'Connor Loan Agreement).
[7] Mr. Palmer's testimony hasn't stood in the way of other glaring contradictions. For example, despite Mr. Palmer's testimony in October 2008 that he has not been the CEO of Debtor since April 2007, and that he never served as the president (Palmer at 20), John Owen swore under oath one month earlier, via a September 29, 2008 Declaration that Mr. Palmer was in fact still Debtor's president and CEO (DE 305).

but USAR (and not the Debtor) received the proceeds of these sales, then the estate may have a fraudulent transfer claim against USAR under Bankruptcy Code §§ 544 and 548 for the consideration paid by the Blank Trust to USAR.

Furthermore, a cursory review of the monthly operating reports filed by the Debtor reveals that Debtor may have certain non-ordinary course payments to USAR after the petition date. *See* Check Register for DIP Account attached to April 2007 monthly operating report [DE 42], showing payments totaling $51,000 to USAR on April 10, 11, and 12, 2007. If this is so, then the estate likely has an avoidance claim against USAR under Bankruptcy Code § 549 for the amounts of these transfers. Those preference claims represent hundreds of thousands of dollars in potential estate assets available to creditors.

### 3. Cause Exists Pursuant To § 1112(B) (4) (J) Because The Debtor Failed To File Or Confirm A Plan

As Debtor owns only one significant asset, the Vineyard Tract, which is the sole source of Debtor's income, Debtor is a single asset debtor. 11 U.S.C. § 101(51B).[8] And while Debtor does not have a per se time limit under which it must organize, Congress expressed its intent that a single asset debtor shall make reasonable efforts to reorganize early in the bankruptcy process. *See* 11 U.S.C. §362 (d) (3). In Section 362 (d) (3) Congress demanded that single asset debtor either (a) promptly file a reasonable reorganization plan or (b) make required monthly payments, or lose the protections of the automatic stay upon the request of a creditor with an interest in that asset. *Id*. Congress thus expressed a policy requiring prompt actions in single asset real estate cases to "prevent single asset real estate cases from dragging on when

---

[8] The term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being

there is little hope of a successful reorganization." 3 *Collier on Bankruptcy*, § 367.07(1) (15th ed. 2008). Here, contrary to that policy, Debtor is languishing in Chapter 11 with no hope of reorganization and without having ever made a single payment to Rock Bottom on Rock Bottom's DIP loan, secured by Debtor's only asset.

Even without a reorganization deadline, Debtor's inactivity is reason to convert. ***Quarles v. United States Trustee,*** 194 B.R. 94 (W.D.Va. 1996) (repeated failure to file a plan of reorganization, "standing alone, could justify a finding of cause"); ***In re K.C. Marsh, Co.***, 12 B.R. 401 (Bankr. D. Mass. 1981) (Debtor has a duty to formulate a plan of reorganization, and failure to "propose a plan under § 1121 can be sufficient reason to convert the case to a liquidation case"); ***In re Vincens***, 2008 WL 2855630 (10th Cir. 2008). (failure to propose plan and move forward with efforts to revive business warranted dismissal for cause". The need to convert only grows stronger when coupled with congressional policy to force single debtors to either reorganize or face foreclosure.

### 4. Conversion To Chapter 7 And Not Dismissal Is In The Best Interest Of The Estate And Creditors

If cause has been shown by the moving party and there are no unusual circumstances showing that maintaining the case in Chapter 11 is in the best interest of creditors, the Court must then consider whether to dismiss the case, convert the case to one under Chapter 7, whichever result is in the best interest of creditors. ***In re Gladys Marie Jayo,*** 2006 WL 2433451, at 6 (Bankr. D. Idaho 2006). *In re **Incredible Auto Sales LLC***, 2007 WL 1100276 (Bankr. D. Montana 2007), citing 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[3] (15th ed. Rev.).

---

conducted by a debtor other than the business of operating the real property and activities incidental. Id.

In this case, conversion to Chapter 7 is in the best interest of the estate and creditors. Although the Estate will lose its sole asset in foreclosure soon, an independent trustee should evaluate the preference and fraudulent conveyance claims against USAR and others, should evaluate the value of the adversary proceeding verses the cost of proceeding, and should evaluate the Debtor's management's activities to determine if monies can be raised for creditors. If this case is dismissed instead, there is a good possibility that because of the conflicts between the related entities, none of these claims will be pursued.

## CONCLUSION

This Debtor may well be the alter ego or USAR or John Owen, and was certainly a convenient place to park the Vineyard Tract asset two days before a trustee's sale to delay the original secured creditor. From date of this likely bad faith filing, things just continue to get worse for this Debtor. The Debtor has never been licensed to do business in Arizona. There is some question if the Debtor ever did any business on the Vineyard Tract. The Debtor has not done any alleged business since soon after the filing. After Rock Bottom became a lender and saved the Vineyard Tract from sale, the Debtor proposed a plan of reorganization that sought to impair Rock Bottom's post-petition loan. The Debtor has been unable to propose a plan of reorganization because the Debtor requires, by its own estimate, about $20 million dollars of financing it has been unable to obtain. The Debtor can not mine the Vineyard Tract because of access issues. Finally, the Debtor has not played by the rules making misrepresentations to the Court about whether it has financing (the forged term sheet) and what the terms of the proposed financing may be (the secret working interests). The last round of "emergency" motions purported to have a lender with $140 million on deposit in Dallas, Texas, however, that lender

-- Page 22

has been unable or unwilling to close its deal with the Debtor and Rock Bottom suspects shenanigans. Finally, the Debtor's activities are causing a substantial and continuing loss and diminution of the Estate. It is high time to convert this case so that preference actions may be brought against USAR and others to create a fund to pay the unsecured creditors. This Debtor has no chance of successfully emerging from a Chapter 11.

RESPECTFULLY SUBMITTED this 28 day of January, 2010.

WARNICKE & LITTLER P.L.C.

By _____
Thomas E. Littler
Robert C. Warnicke
1411 N. Third Street
Phoenix, Arizona 85004
Attorneys for Defendant Rock Bottom, LLC

COPY of the foregoing emailed this this 26 day of January, 2010, to:

Christopher H. Bayley, Esq.
Lori Lewis, Esq.
Andrew A. Harnisch, Esq.
SNELL & WILMER, L.P
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Attorneys for Debtor-in-Possession
Plaintiff U. S. American Stone and
Minerals, Inc.

Jonathan E. Hess
Office of the U. S. Trustee
230 N. First Avenue, Suite 204
Phoenix, Arizona 85003

Joyce Lindauer
8140 Walnut Hill Lane, Suite 301
Dallas, Texas 75231

-- Page 23

Counsel for Debtor

By _Gayle D. Cashbee_

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

In Re:                          * Chapter: 11
                                *
U.S. AMERICAN STONE AND         * Case No. 2:07-bk-01628-GBN
MINERALS, INC.,                 *
                                *
              Debtor.           *
                                *

ORAL DEPOSITION

OF

JOHN OWEN

OCTOBER 24, 2008

ANSWERS AND DEPOSITION OF JOHN OWEN,
produced as a witness at the instance of the
Secured Creditor/Plan Proponent, taken in the
above-styled and -numbered cause on the 24th day of
October, 2008, from 9:04 a.m. to 3:16 p.m., before
Deborah A. Copeland, a Certified Shorthand Reporter
in and for the State of Texas, Registered
Professional Reporter, reported by machine shorthand
at the offices of Locke, Lord, Bissell & Liddell,
located at 2200 Ross Avenue, in the City of Dallas,
County of Dallas and State of Texas.

ORIGINAL

**JOHN OWEN**
**October 24, 2008**

```
 1      Q     Who was that?

 2      A     Hilbrands & Western.

 3      Q     Other than this exploration in regards to

 4   Twin Peaks, did IER do anything else in regards to

 5   that mine?

 6      A     No.

 7      Q     Whatever became of the Twin Peaks mine, do

 8   you know?

 9      A     It's owned by a puppet company right now.

10      Q     What company is that?

11      A     U.S. Corp.

12      Q     Did IER sell its mining claims to

13   U.S. Corp.

14      A     It didn't have them.

15      Q     Excuse me?  What do you mean it didn't have

16   them?  Oh, excuse me.  We talked about it.  Sorry

17   about that.

18            Give me a time frame.  When was IER

19   involved in the Twin Peaks mine?  What years?

20      A     2001.

21      Q     Just 2001?

22      A     (Witness nods.)

23      Q     Okay.  And was that at the same time that it

24   was also involved in the Chastain mine or did the

25   Chastain mine come after that?
```

1    was divided into three parcels and that we had come in

2    and there were three parcels.  When we were introduced

3    to the properties the three parcels were owned by

4    three different people.  And we went in and got the

5    Vineyard first, the Jaquays, and we were negotiating

6    to get the Surgent with Surgent.  We went over those

7    just in general, the property.

8        Q    Did you go over anything else in regards to

9    your plans for the Congress mine?

10       A    Pretty much basically what we had done, the

11   equipment we had, and what we felt we could do and

12   what we felt could be done with the property.

13       Q    So you did discuss the Surgent claims in this

14   meeting, do you believe that?

15       A    Yeah.  Yes.  Because we had it in the data.

16       Q    What did you say to Mr. Tauch and Taucoff --

17   Krasoff, excuse me, regarding the Surgent claims?

18       A    Well, that they would have to be -- we'd have

19   to get that section to operate the mine.

20       Q    So you told them that you needed to obtain

21   the Surgent claim in order to operate the mine?

22       A    Yes.

23       Q    In order to operate an aggregate business; is

24   that correct?

25       A    Right.

1    Q    And why did you tell them you needed to get

2    those claims, the Surgent claims?

3    A    Why did I tell them?

4    Q    Why were they necessary to operate a

5    aggregate mine in Congress?

6    A    Because the -- the mine when it originally

7    operated as a whole and it had gotten divided.  You

8    needed the land, you needed the space, the footprint.

9    And to get all the claims contiguous, you had to put

10   them back together.

11   Q    So ownership of the Surgent claims is

12   necessary to operate an aggregate mine on that

13   property; is that correct?

14   A    In our view it was necessary to operate the

15   property to the best extent.

16   Q    And at that time the Surgent claims were

17   owned by -- Mr. Surgent had already filed bankruptcy

18   at that point?

19   A    Oh, yes.  He filed bankruptcy long before

20   then.

21   Q    So those claims were owned by his Chapter 7

22   estate; is that correct?

23   A    At that time they were.  They weren't when we

24   first started.

25   Q    Okay.

**JOHN OWEN**
October 24, 2008

```
1       Q      And, to your knowledge, this was, in fact,
2   given to Mr. Klein, wasn't it?
3       A      It was given to him?
4       Q      Yes.
5       A      Yes.
6       Q      And you'll see in that loan agreement there's
7   a paragraph titled Working Interest; do you see that?
8       A      Yes.
9       Q      And it says that Mr. Klein shall receive from
10  USAR a one percent working interest in each of the
11  following mines, and then it lists the mines that
12  we've discussed earlier today; do you see that?
13      A      Yes.
14      Q      And one of those mines is the Congress mine,
15  isn't it?
16      A      Yes.
17      Q      Okay.  Why was USAR agreeing to give
18  Mr. Klein a one percent working interest in these
19  mines?
20              MR. BAYLEY:  I'm going to object as to
21  relevance.
22              MR. TAYLOR:  It's not a valid objection.
23      Q      (By Mr. Taylor)  Please answer the question.
24              MR. BAYLEY:  It's a valid objection.
25  You can answer the question.
```

PTI COURT REPORTING
602-710-3000

1     A     Why was -- what was the question?

2     Q     (By Mr. Taylor)  The question is:  Why was

3     USAR giving Mr. Klein a one percent working interest

4     in these mines?

5     A     Because he wanted it.

6     Q     That was part of his consideration for making

7     a loan to U.S. American Stone?

8     A     I'm trying to remember.  No.

9     Q     It wasn't?

10     A     No.

11     Q     So USAR was just giving him a one percent

12     working interest for nothing?

13     A     I'm trying to remember.  Yeah, according to

14     reading the whole thing, it would be part of the

15     agreement, if it was acceptable, or later agreements

16     would be drawn up.

17     Q     How was this one percent interest figure

18     calculated?

19     A     I don't understand.

20     Q     Why -- where did it come from?  Is that

21     something that you offered to Mr. Klein or did he

22     require a one percent interest?

23     A     I believe that's what he asked -- what he

24     wanted.

25     Q     Did you offer him a one percent working

1    interest in exchange for making this loan?

2      A    I think you just asked me did he require it

3    and I said yes, so that means I didn't offer, that's

4    what he wanted.

5      Q    Let me step back.  Who first brought up the

6    topic of getting -- him getting a working interest in

7    USAR mines in exchange for making this loan?

8      A    I don't know.

9      Q    You don't recall who brought that topic up

10   first?

11     A    No.

12                (Exhibit 5 marked.)

13     Q    Mr. Owen, I'm going to show you what's been

14   marked as Exhibit 5.

15     A    Okay.

16     Q    It appears to be a fax from Mr. Klein to

17   Kathy O'Connor, doesn't it, Mr. Owen?

18     A    Yes.

19     Q    And if you look at the two agreements

20   attached there, it appears that Mr. Klein signed both

21   of those agreements, didn't he?

22     A    Yes.

23                (Exhibit 6 marked.)

24     Q    I'm going to hand you what has been marked as

25   Exhibit 6.  Does this appear to be the final loan term

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

In Re:                          * Chapter: 11

                                *

U.S. AMERICAN STONE AND         * Case No. 2:07-bk-01628-GBN

MINERALS, INC.,                 *

                                *

            Debtor.             *

                                *

                                *

                                *


ORAL DEPOSITION

OF

ROBERT PALMER

OCTOBER 27, 2008


ANSWERS AND DEPOSITION OF ROBERT PALMER, produced as a witness at the instance of the Secured Creditor/Plan Proponent, taken in the above-styled and -numbered cause on the 27th day of October, 2008, from 9:16 a.m. to 11:43 a.m., before Deborah A. Copeland, a Certified Shorthand Reporter in and for the State of Texas, Registered Professional Reporter, reported by machine shorthand at the offices of Locke, Lord, Bissell & Liddell, located at 2200 Ross Avenue, in the City of Dallas, County of Dallas and State of Texas.

Stone?

    A    Currently, no.

    Q    So you're not the president or CEO of that company?

    A    I was the CEO.

    Q    When were you the CEO of Stone & Mineral?

    A    December '05 to I guess April of '07.

    Q    Okay.  So you were the president of that company for that period of time?

    A    CEO.

    Q    Were you the president as well or just the CEO?

    A    Just the CEO.

    Q    Did you ever hold any other office with Stone & Mineral?

    A    No.

    Q    Okay.  Now, why did you cease being the CEO in April of '07?

    A    The company was basically out of business.

    Q    Okay.  And I'll get to that in a moment.  So as the CEO of that company -- do you know who is the current CEO of that company?  Does it have a CEO, if you know?

    A    Not that I -- I don't -- not that I know of, or I don't know who it is.

**ROBERT PALMER**
October 27, 2008

Q    Okay.  And when did Stone & Minerals cease
operations at the Congress mine?

A    February, March '07.  I don't recall
specifically.  It was not like it was just close the
door.  There was a trickle effect there of doing what
business we could, so I don't recall specifically.

Q    And let me back up.  Other than operating an
aggregate mine at the Congress mine, did
U.S. American Stone have any other business
operations?

A    Yes.  We had the Little Giant mine.

Q    What did Stone & Mineral do at the
Little Giant mine?

A    We had a crushing plant set up there.  The
Little Giant was a decorative stone mine, completely
different market.  As you know, in Arizona they don't
grow grass, they use decorative color rock.  And
that's -- because of the nature of the geology at the
Little Giant, that was its role for Stone & Minerals
to sell into the decorative stone market.

Q    When did Stone & Minerals operate that
aggregate operation at Little Giant?

A    We operate simultaneous to the Congress.

Q    Okay.

A    January '06 until we ceased business late

**ROBERT PALMER**
October 27, 2008

Q    Okay.  Do you believe that it is possible to conduct an aggregate operation at the Congress mine without having access to the Surgent tracts?

A    Ask that again.

Q    Do you believe it is possible to conduct an aggregate operation removing rock from the Vineyard tracts without having access to the Surgent tracts?

A    I think for it to be successful and efficient, that you would need the Surgent tract as part of the overall mine layout.

Q    And that's consistent with your prior testimony where you said that you believe both the Vineyard and Surgent tracts were transferred to Stone & Mineral, correct?

A    Correct.

Q    Because they were -- it was necessary to operate them as a package, correct?

A    Yes.

Q    Why did Stone & Mineral cease operations in March or April of 2007?

A    Out of money.

Q    Any other reason?

A    No.

Q    After Stone & Mineral ceased operations in March or April of 2007, you said you left as CEO in

Case 2:07-bk-01628-GBN    Doc 476    Filed 01/28/10    Entered 01/28/10 14:53:26    Desc
Main Document      Page 37 of 68

there is a viable business at the Congress mine for Stone & Minerals?

A    Because I lived and breathed it for 16, 17 months trying to understand the market.

Q    Okay.  Other than market, I mean, what would -- tell me what -- given the state of things right now, what would Stone & Minerals have to do to resume operations at the Congress mine?

A    Would have to have the funding in place to reacquire equipment, crushing equipment, trucks, start from scratch, basically.

Q    So it would need equipment, right?

A    Yes.

Q    Do you have an idea of how much money it would take to reacquire that equipment for the Congress mine?

A    Several million dollars.

Q    Are we talking -- go ahead.  I'm sorry.

A    I don't have a definitive number, but it would be several million dollars by the time you have to go and put deposits down and reestablish relationships with the vendors, those types of things.

Q    So several million dollars to -- we're talking two to three million just for -- is that a ballpark figure here?

A     It would take more than that.

Q     More than three million?

A     Yes.

Q     So more than three million dollars to acquire the equipment, reestablish relationships with customers; is that correct?

A     Correct.  Working capital.

Q     Working capital.  Hire employees, right?

A     Correct.

Q     Startup, basically?

A     Startup.

Q     Mobilization?

A     Startup mobilization.

Q     And you would need to reestablish those contacts with customers because at this point Stone & Mineral doesn't have any relationship with any customers, does it?

A     As a functioning business, the relationships are not there, but the relationships are still there.

Q     Why do you say that?

A     Because of the interest in the Congress mine from some local companies.

Q     How do you know about that interest?

A     Because I know the Congress mine was the only mine that could supply that grade of material.

# EXHIBIT 3



| Home | Election Services | Business Services | Public Services |

## Registered Name
### Information Search
Generated by TnT Names Search Version 3.10

**Instructions**

## WORDS: U.S. AMERICAN STONE AND MINERAL
## SEARCH_TYPE: PW

### Click on ID number to see the full detail.

| ID | Type | Name |
| --- | --- | --- |

No matches found.

---

©Copyright 2000 by Arizona Secretary of State - ALL RIGHTS RESERVED

Please email your comments or questions regarding this system to trades@azsos.gov. We appreciate any feedback.

**Disclaimer**



Home | Election Services | Business Services | Public Services

# Registered Name
### Information Search
Generated by TnT Names Search Version 3.10

**Instructions**

## WORDS: U.S. AMERICAN RESOURCES
## SEARCH_TYPE: PW

## Click on ID number to see the full detail.

| ID | Type | Name |
|----|------|------|

No matches found.

---

©Copyright 2000 by Arizona Secretary of State - ALL RIGHTS RESERVED

Please email your comments or questions regarding this system to trades@azsos.gov. We appreciate any feedback.

Disclaimer

# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| In Re: | ) | Proceedings Under Chapter 11 |
|  | ) |  |
| U.S. AMERICAN STONE AND | ) |  |
| MINERALS, INC., | ) | Case No. 2:07-bk-01628-GBN |
|  | ) |  |
| Debtor. | ) |  |

## DEPOSITION OF MICHAEL E. ANABLE

Phoenix, Arizona
October 1, 2008
10:10 a.m.

**REPORTED BY:**
Debra Riggs Torres, RPR
Certified Reporter
Certificate No. 50647

**PREPARED FOR:**
Mr. Marvin C. Ruth

*(Copy)*



3030 North Central Avenue
Suite 1102
Phoenix, Arizona 85012

T 602.264.2230
888.529.9990
F 602.264.2245
www.griffinreporters.com

[1] A: Yes.

[2] Q: And how many times?

[3] A: As an expert, one. One time.

[4] Q: And can you tell me the name of the case?

[5] A: That would be Siebert Cattle Company vs. State of

[6] Arizona. Something along those lines.

[7] Q: Did you say cyber?

[8] A: Siebert. It's the person's name.

[9] Q: What's the spelling of that?

[10] A: S-I-E-B-E-R-T, I believe.

[11] Q: And safe to say, you've never testified for Rock

[12] Bottom or the Chiron Financial Company?

[13] A: Correct.

[14] Q: And what was the scope of your testimony in that

[15] Siebert Cattle Company case?

[16] A: The — the case was about whether or not the

[17] state agencies had caused the — the failure of a business

[18] transaction to be consummated because of their actions and

[19] lack of notification to their lessee, who was Siebert.

[20] And I investigated the actions of the agency and reported

[21] on the lack of notification that we believe was required.

[22] Q: And are there other cases in which you've

[23] testified in court as an expert?

[24] A: I hesitate, because in my years with the Land

[25] Department, I testified a number of times. I didn't

[1] prepare expert testimony, but as I recall, I believe there

[2] are times when the attorneys argue whether or not you are

[3] providing expert testimony, so there very well could be

[4] other times when I was providing expert testimony.

[5] Q: I see.

[6] A: But it would have been many years back.

[7] Q: And aside from this case and the Siebert Cattle

[8] Company case, have you prepared any expert reports in

[9] connection with legal proceedings?

[10] A: Yes. I provided an expert report for the City of

[11] Scottsdale vs. Toll Brothers condemnation case. And I am

[12] in the midst of preparing one for another case.

[13] Q: Who do you deal with at Rock Bottom?

[14] A: My primary —

[15] MR. RUTH: Object to the form.

[16] MR. HARNISCH: You can answer.

[17] THE WITNESS: My primary contact is Eric

[18] Israel, although I do communicate with Jay Krasoff from

[19] time to time.

[20] Q: BY MR. HARNISCH: And have you ever become

[21] acquainted with Kyle Tauch?

[22] A: I believe he's been in one, maybe two meetings,

[23] that I was —

[24] Q: Okay.

[25] A: — a participant in.

[1] Q: And are you aware that Stone and Mineral is a

[2] debtor in a bankruptcy case?

[3] A: Generally.

[4] Q: And when did you become aware of that?

[5] A: I'm — I'm not certain. I mean, somewhere over

[6] the course of — I mean, from — early on I knew that

[7] there was a bankruptcy involved, you know, when Stone and

[8] Mineral's name was made known to me.

[9] I have not been involved really with the

[10] discussions going on in the bankruptcy case. I know very

[11] little about the machinations of that whole thing.

[12] (Deposition Exhibit No. 1 marked for

[13] identification.)

[14] Q: And did you prepare this document that I've

[15] handed you called Report of Expert Witness?

[16] A: Yes.

[17] Q: And what is the purpose of this report?

[18] A: There's a twofold purpose. One was to explain

[19] that via my research, I don't believe there is legal

[20] access to the Vineyard patents. And also that, because of

[21] that, title insurance policies would likely exclude from

[22] coverage any insurance based on legal access.

[23] Q: Okay. And for ease of reference, I'm going to

[24] call the subject property that you referred to as the

[25] Vineyard patent, I'll call it the Vineyard patent or

[1] Vineyard property.

[2] A: Okay.

[3] Q: Are you aware of who owns the Vineyard property?

[4] MR. RUTH: Object to the form.

[5] THE WITNESS: I — I believe I have been

[6] aware of it, because in my research I would have — I

[7] would have identified the Vineyard patents and who owns

[8] it. I cannot say that I — without looking at my notes —

[9] I could give you the exact name of who owns it.

[10] Q: BY MR. HARNISCH: Okay. Who asked you to prepare

[11] this document?

[12] A: This document here?

[13] Q: Yeah. The expert report.

[14] A: That would be the —

[15] (Telephone interruption.)

[16] A: I'm sorry. That would be Marvin Ruth and this

[17] law firm.

[18] Q: Would it be — you mentioned before that you

[19] don't know off the top of your head who the owner of the

[20] Vineyard property is. Would it be accurate to say that

[21] you're aware that Rock Bottom is not the owner of the

[22] property?

[23] MR. RUTH: Object to the form.

[24] THE WITNESS: That is my understanding.

[25] They're involved in the bankruptcy in some manner, to — I

REPORT OF EXPERT WITNESS
MICHAEL E. ANABLE OF
FORAY LAND CONSULTING,LLC.

## BACKGROUND

I am a resident of the State of Arizona, residing at 2523 E. Cochise Road, Phoenix, Arizona, 85028. I am currently the sole Member/Manager of Foray Land Consulting, LLC and have been retained by Lewis & Roca, LLP to offer expert testimony in support of confirmation of Rock Bottom, LLC's plan in the U.S. American Stone and Mineral, Inc. bankruptcy. Attached as Exhibit "A" is a true and correct copy of my Curriculum Vitae. Also attached as Exhibit "B" is a schedule of my testimony at trial or deposition for the proceeding four years. I am being compensated at an hourly rate of $200.00 for this engagement.

As evidenced by my Curriculum Vitae, I have worked in the land management field for approximately twenty years, in both the private sector and with state and federal government agencies. The last twelve years were either as a top level government agency director or as the owner of a land management consulting company. During my years in the field of land management, I have supervised many departments responsible for implementing land management practices and have overseen the implementation of many land management or real estate disposition projects. Since 2003, I have been the sole Member/Manager of Foray Land Consulting, LLC and have assisted many clients in a myriad of land management or real estate related projects.

## SUBJECT MATTER

I have been retained by Lewis & Roca to opine as to whether the Vineyard mining patents have a perfected legal right of way across state and federal lands to an existing public roadway. The Vineyard patents are situated north of the community of Congress, Arizona, and are separated from public roadways by state and federal land. I have also been asked to opine as to whether title insurance policies would typically exclude from coverage issues arising out of the lack of legal access.

## OPINIONS

I have knowledge of the facts and opinions stated in this report based on review of documents referenced below. In forming my opinions I have relied on my experience and knowledge gained from approximately twenty years of employment in government land management agencies and operating my own company. I have examined the records of the U.S. Bureau of Land Management, and the Arizona State Land Department.

Based upon this information, it is my opinion that:

> ➤ The Vineyards Patents lack legal access across state and federal land.



EXHIBIT NO. 1
_Anable_
10-1-08
Debra Riggs Torres. CR50847

> Title insurance companies would exclude from a policy any coverage based on legal access.

## ANALYSIS

An examination of land dispositions (sales, leases, right of way, permits) on the state land surrounding the Vineyard patents was undertaken on the computerized title records of the Arizona State Land Department in the agency offices in Phoenix, Arizona. Similarly, U.S. Bureau of Land Management databases (LR2000 Land and Mineral Records Database, Federal Land Patents Database, Master Title Plats, and GeoCommunicator) were examined for all federal dispositions on the surrounding land. Subsequently, all contracts issued by those agencies were examined.

I have gained experience with land title insurance issues by dealing with individuals seeking to perfect legal access, my own experience perfecting legal access, and through communication with title insurance companies.

## CONCLUSIONS

My examination of the state and federal title records revealed no record of either a public roadway or non-exclusive roadway right of way which crossed the entirety of the state and federal land surrounding the private lands (including the Vineyard Patents) north of the community of Congress, Arizona. Records found and examined included rights of way for electric transmission, water transmission, and a non-exclusive access road and waterline to an individual which did not come closer than approximately one half mile to the Vineyard patents.

Therefore, I conclude that there is no legal access to the Vineyard patents.

Base on my experience with insurance companies which issue title insurance policies, it would be standard practice for the insurance industry to exclude from a policy coverage based on the lack of legal access. The insurance industry prefers to issue title policies where perpetual access has been obtained. For access rights which are less than perpetual, policies may be written which cover only the length of time that access is guaranteed. The Vineyard patents have no legal access; therefore, I conclude that title insurance for access issues would be excluded from a policy.

Respectfully submitted,

Dated this 4 day of September, 2008

_Michael E Cable_

Michael E. Anable
Foray Land Consulting, LLC

EXHIBIT A

# CURRICULUM VITAE

## MICHAEL E. ANABLE

### CURRENT OCCUPATION
Owner: Foray Land Consulting, LLC
3509 E. Shea Blvd, Suite 117
Phoenix, AZ 85028
(602)992-1884

### EDUCATION
M.S. Renewable Natural Resources, University of Arizona, Tucson, AZ, 1990
B.S. Renewable Natural Resources, University of Arizona, Tucson, AZ, 1987

### EXPERIENCE
Approximately 14 years of government land management experience with both state and federal government, including six years in the positions of Arizona State Land Commissioner and Deputy State Land Commissioner. Recent experience includes more than 5 years as a private consultant providing expert services to developers, mining companies, law firms, agricultural entities, communication companies, and educational entities.

### ACTIVITIES AND ACHIEVEMENTS:
Member of the Governor's Water Management Commission, 2001-2002
Member of the Governor's Growing Smarter Oversight Commission, 2002
Member of the Arizona State Parks Board, 1999-2002
Member of the Military Airports Oversight Committee, 1999-2002
President-Elect, Western States Land Commissioner's Association, 2002
Manager and Coach of Little League Baseball Teams, 2005-Present

### PUBLICATIONS:
"Spread of Introduced Lehmann Lovegrass (Eragrostis Lehmannjana Nees.) in Southern Arizona, U.S.A.", by Michael E. Anable, Mitchell P. McClaran, George B. Ruyle. Biological Conservation. (1992) 61, 181-188.
" Spread of Introduced Lehmann Lovegrass Along a Grazing Intensity Gradient" by Mitchell P. McClaran and Michael E. Anable. Journal of Applied Ecology. (1992) 29, 92-98.

EXHIBIT B

## SCHEDULE OF TESTIMONY AT TRIAL OR DEPOSITION

CITY OF SCOTTSDALE vs. TOLL BROTHERS AZ CONSTRUCTION COMPANY, ET. AL. CASE NO. CV2004-0011025

JOHN F. SEIBERT ET. AL. vs. ARIZONA STATE LAND DEPARTMENT, ET. AL. CASE NO. CV2006-015297

# EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re: | ) Proceedings Under Chapter 11 |
| | ) |
| U.S. AMERICAN STONE AND | ) |
| MINERALS, INC., | ) Case No. 2:07-bk-01628-GBN |
| | ) |
| Debtor. | ) |

---

## DEPOSITION OF PETER T. LENTON

Phoenix, Arizona
October 1, 2008
2:00 p.m.

**REPORTED BY:**
Debra Riggs Torres, RPR
Certified Reporter
Certificate No. 50647

**PREPARED FOR:**
Mr. Marvin C. Ruth

*(Copy)*



3030 North Central Avenue
Suite 1102
Phoenix, Arizona 85012

T. 602.264.2230
 888.529.9990
F 602.264.2245

www.griffinreporters.com

[1] You can answer.

[2] THE WITNESS: Okay.

[3] MR. RUTH: It's just for the record.

[4] THE WITNESS: Most of my direction comes

[5] from Eric Israel.

[6] Q: BY MR. HARNISCH: Are you acquainted with Jay

[7] Krasoff?

[8] A: Yes, I know Jay.

[9] Q: And are you acquainted with Kyle Tauch?

[10] A: Yes.

[11] Q: Okay. But your primary directives come from Eric

[12] Israel?

[13] A: Yeah, correct.

[14] Q: Okay. Are you aware that Stone and Mineral is a

[15] debtor in a bankruptcy case?

[16] A: Only indirectly, yeah.

[17] Q: Okay.

[18] A: I mean ...

[19] Q: And when did you become aware of that bankruptcy

[20] case?

[21] A: At the time that we engaged with Rock Bottom.

[22] Q: And through whom did you become aware of the

[23] bankruptcy case?

[24] A: Through my supervisor.

[25] Q: And what's your supervisor's name?

[1] A: His name is Mike Young.

[2] MR. HARNISCH: Can I have this marked as

[3] Exhibit 1, please.

[4] (Deposition Exhibit No. 1 marked for

[5] identification.)

[6] Q: BY MR. HARNISCH: And did you prepare this

[7] document that's been marked as Exhibit 1?

[8] A: I did.

[9] Q: Okay. And what — what is this document?

[10] A: This document is an expert opinion of the value

[11] of tailings material located at the Congress Mine.

[12] Q: Okay. And are you aware of the owner of the

[13] subject property of this report?

[14] A: No. No, I haven't had any — I'm not familiar

[15] with — with the owner.

[16] Q: Okay. And who asked you to prepare this report?

[17] A: My supervisor.

[18] Q: Okay. That would be Mike Young?

[19] A: Correct.

[20] Q: Prior to preparing this report, did you speak to

[21] any representatives of Rock Bottom about this project?

[22] A: I had conversations with Eric Israel and Jay

[23] Krasoff.

[24] Q: And what was the substance of your conversation

[25] with Eric Israel?

[1] A: I guess, can you clarify the question?

[2] Q: You said you had conversations with Eric Israel

[3] and Jay Krasoff after you had been assigned this report,

[4] but prior to completing it, and I'm asking about the

[5] nature of your conversation with Eric Israel.

[6] A: The nature of the conversation was really just to

[7] clarify the — clarify my directive to create this expert

[8] opinion.

[9] Q: And your conversation with Jay Krasoff, what was

[10] the nature of that conversation?

[11] A: That was in a similar vein.

[12] Q: Okay. And describe the methodology that you used

[13] when preparing this report.

[14] MR. RUTH: Object to the form.

[15] THE WITNESS: I — I basically analyzed the

[16] value of recoverable gold within the tailings impoundment

[17] at Congress Mine, and also looked at what options there

[18] were for recovering that gold and the respective cost of

[19] gold recovery using each respective option.

[20] There was a couple of documents that I

[21] reviewed in creating this report. I think those are

[22] listed at the back of the report.

[23] Q: BY MR. HARNISCH: Are those the references that

[24] are listed on page 7 of Exhibit 1?

[25] A: Yeah. That's where I got the information

[1] regarding the volume of material within the tailings

[2] impoundment, as well as the estimated grade of gold

[3] available. Or of gold in total, not recoverable gold.

[4] And, similarly, for the silica project

[5] investigation report, one of the options for recovery

[6] allowed for — or one of the options that we investigated

[7] was one of smelting to recover remaining gold. And in

[8] that operation, at times you can get a credit, if you —

[9] if there's a certain value of silica, and so that report

[10] as referenced in the bibliography was the basis of that

[11] part of the investigation.

[12] Q: Okay. And when you were preparing your report,

[13] did you rely on any sources, besides the ones that are

[14] listed on page 7?

[15] A: I relied on some work that we've done in a

[16] similar vein for other clients.

[17] Q: Okay.

[18] A: I'm going to grab another drink, if that's okay?

[19] Q: Certainly.

[20] Turning to the report itself, in the first

[21] paragraph of the section marked Introduction, the second

[22] sentence reads: I have been informed that U.S. American

[23] Stone and Mineral, or their representatives, have asserted

[24] that the tailings contain gold worth many million of

[25] dollars, and are thus a valuable asset of that company.

## INTRODUCTION

I have been retained to render an expert opinion regarding the potential value of gold in tailings within the area of the Congress Mine. I have been informed that US American Stone and Mineral or their representatives have asserted that the tailings contain gold worth many million of dollars and are thus a valuable asset of that company.

I am a resident of the State of Arizona, residing at 7136 N. 15th Place, Phoenix, Arizona 85020. I am currently a Supervising Engineer at Brown and Caldwell and have been retained by Rock Bottom LLC, in this matter.

Attached as Exhibit "A" is a true and correct copy of my Curriculum Vitae. Also attached are Exhibit "B," a schedule of all articles I have published in the past ten years and Exhibit "C," a schedule of my testimony at trial or deposition for the preceding four years. I am being compensated at an hourly rate of $189.00 for this engagement.

As evidenced by my Curriculum Vitae, I have worked in the Mining industry for more than ten years as a Mining Engineer. I am a Registered Professional Engineer (Mining) in Arizona, Registration no. 33501. During my time in the mining industry I have been responsible for mine design, mine engineering, resource studies and feasibility studies for gold and copper mines in Arizona, Nevada as well as Australia and South America.

## ABSTRACT

The various tailings materials located within the historic Congress Mine in Congress, Arizona (Site) contains an estimated one millions tons of material at an average estimated grade of 0.04 ounces of gold per ton. When considering the total cost to responsibly reprocess or refine these materials and the difficulty of fully recovering the remaining gold, it becomes apparent that the costs associated with recovering gold from the tailings materials at Congress Mine far exceed the value of the recoverable gold contained within the tailings by between $9.8 million and $48.3 million depending on the method selected for gold recovery.

This model assumes a spot gold price of $950/oz however volatility of the spot gold market could either positively or negatively affect the viability of reprocessing of tailings at the Congress Mine. It should be noted that even for the option of on site reprocessing, which is the most cost effective of the two tailings reprocessing options considered, the spot gold price would need to rise to $1,327/oz in order for reprocessing of the tailings materials to simply break even.

Historic tailings at the Congress Mine are regulated under various state and federal environmental statutes and regulations. Disturbing these materials will trigger significant new environmental liabilities at the Site in the form of permitting, closure and reclamation requirements. This cost estimate does not include the incremental environmental liability of having disturbed these materials.

EXHIBIT NO. 1
Lenton
Debra Riggs Torres, CR50647

1

## OPINION

Based on my analysis, it is my opinion that the cost of extracting gold from the tailings materials at Congress Mine exceeds the value of that gold. Therefore I dispute that the tailings at Congress Mine have any economic value as a gold resource.

## ANALYSIS

The historic Congress Gold Mine is located north of the town of Congress in Yavapai County, Arizona as shown in Figure 1. The Site has been mined for gold on an intermittent basis since the 1890's and concluding in the early 1990's.

Ore mined at the Congress Mine over the years were treated using a variety of processing and gold recovery techniques. These processing and recovery techniques are intended to physically and chemically separate the gold from the surrounding host rock. Depending on the means employed and the unique geology and mineralogy of the gold deposit, gold recovery (measured as the percentage of gold recovered from the total amount of gold present) varies significantly. When gold recoveries during the milling and processing are high, the resultant gold concentrations in the process wastes (known as tailings) are conversely lower.

At the Congress Mine, milling and processing techniques (collectively referred to as beneficiation) evolved significantly and ore processed in the 1800's and early 1900's utilized less efficient stamp mills with gold recovery techniques. Because of the lower gold recoveries, the processed waste rock generated as a result of the earlier beneficiation efforts (referred to as tailings) generally had higher gold values. The tailings were deposited randomly throughout the Site as shown in Figure 2 and labeled "Historic tailings within Congress Mine".

During the 1990's, ore mined at the Site was processed using a modern on site mill where ore was crushed, screened and then gold recovered using a CIL (carbon in leach) process. Once the recoverable gold was removed from the crushed ore, the tailings were deposited into a lined 18-acre tailings impoundment at the location as shown in Figure 2 and labeled "Tailings within Congress Mine". Because the ore was processed using more efficient beneficiation techniques, the grade of the resultant tailings was comparatively lower than the earlier tailings processed on the Site.

The primary question to be considered is what amount of gold not previously recovered in initial processing and deposited into the tailings impoundment and tailings piles located within the Congress Mine could be successfully recovered through some method of tailings reprocessing.

Based on my experience at other reprocessing operations throughout the United States and Australia, options for reprocessing of the tailings material are principally regrinding and releaching, or smelting. Each option has unique costs and gold recovery efficiencies which are discussed below.

An important consideration when determining the value of gold remaining within the tailings is that of gold recovery factor. In order to extract gold from the tailings it must be liberated either through smelting or grinding and chemical process. In both cases, less than 100 percent of the total contained gold can successfully be extracted. In the case of smelting, where tailings are melted to separate and recover the gold, losses within the process typically result in a recovery of approximately 90 percent. In the case of less efficient chemical processes, further grinding of the tailings is required to expose encapsulated gold not recovered previously through prior chemical process and allow this exposed gold to be captured through complexing with chemical reagents. This additional grinding does not liberate all encapsulated gold and furthermore the chemical process also includes losses meaning that recovery through grinding and chemical process is typically between 50 to 65 percent. For the purpose of this model, we will assume a recovery of 65 percent in the case where grinding and chemical process is used.

A US American memorandum "Congress Tailings and Waste Rock Summary" dated August 23, 2006 reports the total tonnage of tailings at the Site at one million tons. Additionally, limited sampling of these tailings by others indicate an average gold grade of 0.04 oz/ton. Although this data has not been independently validated, I have assumed that the information is correct in the following analysis. Furthermore, given some prior reprocessing of tailings at the Site the amount of gold recoverable through future reprocessing would be somewhat reduced however, for simplicity this model will use the volumes and grades in the Cardinal report.

## Smelting Option

Smelting would require that the tailings materials at the Congress Mine be excavated, shipped and processed at a Smelter. The smelter will essentially melt the tailings in a specialized furnace and recover most of the precious metals present in the material.

Given that rail is available near the Site, and considering the high cost of fuel making road transportation impractical, rail would be the most economic form of bulk transportation. The closest smelter is approximately 500 miles from the Site located in El Paso, Texas. Based on my experience I estimate that the cost of loading, transportation to the closest smelter would be approximately $30 per ton and the cost of smelting and disposal of remaining waste material as slag would be approximately $50/ton for a total processing cost per ton of approximately $80.

Given that gold recovery through smelting would include a recovery factor of approximately 90%, the recoverable value of gold in the tailings would be approximately $34 per ton. In some cases, smelters will give credit for feed material which includes flux that could be beneficial to the smelting process. However a Cardinal Resources

<u>Silica Project Investigation Report</u> dated July 2006 and prepared for U.S. American concluded that the tailings at the Congress Mine are not suitable for use as flux or filter media.

The disturbance of modern or historic tailings at the Site would trigger substantial environmental liabilities including the closure of the existing tailings impoundment and the reclamation and closure of any disturbed lands. It is conservatively estimated that these costs would approach $500,000 for closing the existing impoundment and $2,000,0000 for reclaiming and closing any areas with disturbed historic tailings.

*Smelting Option*

| Tailings Available (tons) | Average Grade (oz Au/ton) | Average Spot Gold Price ($/oz) | Recovery (%) | Maximum Value of Gold Recovered ($) |
|---|---|---|---|---|
| 1,000,000 | 0.04 | 950 | 90% | $34,200,000 |

| Tailings Available (tons) | Cost of loading and rail haulage to smelter ($/ton) | Cost of Smelting and Waste Disposal ($/ton) | Total Cost of Loading and Rail Haulage to Smelter, Smelting and Waste Disposal ($) |
|---|---|---|---|
| 1,000,000 | 30 | 50 | $80,000,000 |

| Cost for Reclamation of Existing Tailings Impoundment ($) | Cost for Reclamation of Areas with Disturbed Tailings ($) | Total Reclamation Costs ($) |
|---|---|---|
| 500,000 | 2,000,000 | $2,500,000 |

Profit (Loss)     ($48,300,000)

## On-Site Tailings Reprocessing Option

A second option for reprocessing of the tailings material would require further grinding of the tailings in an effort to liberate encapsulated gold and then recovery of this gold through a Carbon in Leach (CIL) process. The reprocessing would require the construction of a new mill and support facilities. It is estimated that the capital cost for construction of a nominal 200 ton per day (tpd) mill would be approximately $15M, with salvage value at the end of the reprocessing of the tailings estimated at $1M.

This option would generate a reprocessed tailings that would require permitting and disposal. Given recent experience, assuming that the waste generated as a result of reprocessing could be disposed of on site, it would be necessary to permit, construct and close a new tailings impoundment as the existing tailings impoundment is out of compliance.

As with the previous option, the disturbance of historic tailings at the Site would trigger substantial environmental liabilities including the closure of the existing tailings impoundment, the permitting of a new impoundment and the reclamation and closure of any disturbed lands. It is conservatively estimated that these costs would approach $0.5M for closing the existing impoundment, $3M for designing, permitting and constructing a new impoundment, and $2M for reclaiming and closing any disturbed historic tailings.

Operating costs per ton of tailings processed are estimated at $15 per ton. A recovery of 65 percent is assumed.

*On-Site Tailings*
*Reprocessing Option*

| Tailings Available (tons) | Average Grade (oz Au/ton) | Average Spot Gold Price ($/oz) | Recovery (%) | Maximum Value of Gold Recovered ($) |
|---|---|---|---|---|
| 1,000,000 | 0.04 | 950 | 65% | $24,700,000 |

| Capital Cost of Onsite Plant for Reprocessing ($) | Salvage Cost of Onsite Plant for Reprocessing ($) | Net Capital Cost for Plant for Reprocessing ($) |
|---|---|---|
| 15,000,000 | 1,000,000 | $14,000,000 |

| Tailings Available (tons) | Operating Costs for Reprocessing of Tailings ($/ton) | Total Cost of Reprocessing and Waste Disposal ($) |
|---|---|---|
| | | |

| | | | |
|---|---|---|---|
| 1,000,000 | 15 | $15,000,000 | |

| Cost for Permitting and Construction of New Tailings Impoundment ($) | Cost for Reclamation of Existing Tailings Impoundment ($) | Cost for Reclamation of Areas with Disturbed Tailings ($) | Total Reclamation Costs ($) |
|---|---|---|---|
| 3,000,000 | 500,000 | 2,000,000 | $5,500,000 |

Profit (Loss)  ($9,800,000)

## SUMMARY

As indicated above, it is my opinion that under either extraction method the cost of extracting gold from the tailings at Congress Mine exceed the value of that gold.

## DISCLAIMER

I have knowledge of the facts and opinions stated in this report based upon my review of the documents listed as References below. My views are subject to change as additional information becomes available or is clarified through additional discovery and depositions. I expect to review depositions of important witnesses as they become available to me.

Any use of terms such as agreement, contract, good faith and fair dealing, liability, negligence and other terms, in the context of this Report, are not opinions from a legal perspective, but from a business perspective as such terms are commonly used in the ordinary course of business.

In forming my opinions, I have relied on my own experience and knowledge from more than ten years in mine planning and operations, in directing subordinate mine personnel and in consulting to mine operations.

To the extent that I have provided estimates of potential regulatory liability and compliance costs, processing cost estimates, financial analyses or feasibility studies, such estimates are subject to incomplete information and inherent uncertainties that are beyond my control. Such incomplete information or uncertainties include, but are not limited to, lack of detailed mineralogical studies, limited and unverified assay information, variability of transportation and disposal costs, reprocessing feasibility and gold recovery as well as fluctuations in the price of gold.

REFERENCES

1.   "Congress Tailings and Waste Rock Summary" dated August 23, 2006

2.   "Cardinal Resources Silica Project Investigation Report" dated July 2006

3.   NYMEX- New York Mercantile Exchange- Spot Price of Gold

# EXHIBIT A

# PETER T. LENTON, P.E.

## Experience Summary

Peter Lenton has more than 19 years of experience in a broad range of engineering roles directly in or related to the International and U.S. Mining Industry. With engineering experience in Open Pit and Underground Mining, and Aggregate Resource Operations, he has developed a solid understanding of both the financial and operational criteria necessary for a competitively successful mining operation. The ever increasing emphasis on environmental compliance in the Mining Industry has allowed him to focus his experience in mine reclamation, regulatory compliance, contractor oversight and management, and remediation. With additional experience with computer based modeling he can add value in performing resource evaluations, feasibility studies and planning. This ability and knowledge make him a valuable team player in any project involving regulatory compliance, mine resource evaluation, project cost estimation, mine reclamation and clean closure, or project planning and optimization.

**Assignment**
*Mining Specialist*
**Education**
*B.S., Mine Engineering, West Australian School of Mines*
*MBA, Grand Canyon University*
**Registration**
*Professional Engineer No. 33501, Arizona*
**Training**
*MSHA Instructor*
**Experience**
*19 years*
**Joined Firm**
*1997*

## Representative Experience

### Aquifer Protection Permit, Clean Closure Plan and Reclamation Cost Estimation, Confidential Client

Project Manager. Responsible for site characterizations, research and evaluation of remediation options, estimation of option costs, and development of comprehensive project cost estimates. Wrote technical permit applications to multiple agencies and responded to regulatory inquiries.

### Due Diligence Acquisition Evaluations. Hanson Building Materials America and Others, Sites in Nevada, California, Utah, Arizona, and Other Locations

Project Manager. Evaluated permit requirements, and compliance status, and directed preparation of resource models and resource estimates for sand and gravel pits, and hard rock quarries in a number of states, including numerous properties in Arizona and Southern California. Developed company wide standards, procedures, and checklists for operating permit, mine and reclamation plan, and environmental resource data reviews, and established corporate quality control standards for resource estimates.

### Feasibility Studies. Confidential Clients, Sites in Nevada, California, Utah, Arizona, and Other Locations

Project Manager. Completed resource estimations for aggregate properties in the southwest region. Developed optimized mine plans and schedules and cost estimates for multiple properties. Developed bench marking standards for mine productivity. Prepared financial models and sensitivity analyses based on environmental sensitivities and geographic factors.

### Reclamation Planning, Confidential Clients, Nevada

Project Manager. Prepared volumetric analysis and reclamation plans for large scale surface and underground gold operations within Nevada. Created cost models and managed contractor bid process. Wrote permit applications and responded to technical inquiries from regulatory agencies.

BROWN AND CALDWELL

Case 2:07-bk-01628-GBN    Doc 476    Filed 01/28/10    Entered 01/28/10 14:53:26    Desc
Main Document    Page 61 of 68

**Design and Construction, Leach Pad and Pond Facilities, Nevada**
Project Engineer. Prepared environmental summaries, mine operating plans, and reclamation plans for proposed mining operations on state land leases. Directed construction and compliance activities including contractor selection and supervision. Worked closely with regulatory agencies on facility permitting and compliance including development and demonstration of engineering best practices.

**Mine Operating Plans, Confidential Clients, Arizona**
Project Engineer. Prepared environmental summaries, mine operating plans, and reclamation plans for proposed mining operations on state land leases. Negotiated with regulatory agencies to determine practical operating and closure standards for new mine development and mine expansion. Created financial and environmental risk models to drive planning and budgeting.

**Mine Property Transfer, Development, Operation, Reclamation and Closure Plans and Permits, Confidential Clients, Numerous States**
Project Engineer. Evaluated permit correspondence, terms, conditions, and compliance status, and directed preparation of resource models, resource estimates, and mining/processing plans for metal and coal mines, sand and gravel pits, and hard rock quarries.

**Remedial Repairs and Closure Plans, Confidential Clients, Various Sites in Nevada and Arizona**
Project Engineer. Directed preparation of remediation plans, and final reclamation plans, for gold and copper heap leach facilities, tailing impoundments, and waste rock dumps in Nevada and Arizona. The work scopes included preparation of cost estimates, stormwater runoff analyses and designs, and final grading plans.

**Floodplain Use Permits and Plans, Arizona, Confidential Clients**

Project Engineer. Directed the preparation of hydraulic studies (HEC-RAS and HEC-6), erosion and control plans, plans of operation, reclamation plans, and other analyses required for Floodplain Use Permit applications. Projects involved interaction and negotiation with local Flood Control agencies, direction of sub-contractors, extensive interaction with client legal counsel, and litigation support.

## Additional Experience

Project experience with operations permitting, construction, and reclamation plans for mine sites includes:

**Placer Dome, Bald Mountain Operations**
Mining Engineer: Responsible for short range and long range mine planning and scheduling for a 50,000 ton per day, three shovel, open pit gold mine. Maintained the ore control system and database, performed ore control and optimized processes with mine and mill personnel. Responsible for new mine permitting and bringing new operations into

Case 2:07-bk-01628-GBN   Doc 476   Filed 01/28/10   Entered 01/28/10 14:53:26   Desc
Main Document      Page 62 of 68

production. Completed mine reclamation planning and financial assurance negotiation.

**BHP Iron Ore, Mount Whaleback Operations**
**Mining Engineer:.** Responsible for long range mine planning for a 400,000 ton per day large open pit Iron Ore mine. Responsible for budgeting and forecasting. Maintained highwall stability plan and worked closely with geotechnical resources to evaluate practical mine designs for future mining operations.

**American Resource Corporation, Goldfield Operations**
**Mine Engineer:.** Responsible for permitting and construction of new 25,000 ton per day open pit mine including innovative use of new gold recovery techniques. Completed resource estimation and feasibility study for mine expansion. Responsible for mine planning and operations. Developed and executed mine reclamation plan ($3,000,000 Project).

**American Resource Corporation, International**
**Mine Engineer:.** Conducted due diligence and feasibility studies for new and existing operations within Central and South America. Permitted new mine in Uruguay. Worked closely with local and regional government agencies to develop mine operating and reclamation standards.

**Western Mining Corporation, Kambalda Operations**
**Mine Engineer.** Drill and blast planning and coordination for a 150,000 ton per day underground mine. Responsible for equipment evaluation and selection. Completed mine dewatering studies. Responsible for resource estimation and mine planning.

# EXHIBIT 6

1

2 UNITED STATES BANKRUPTCY COURT

3 DISTRICT OF ARIZONA

4

5 In Re:                          Chapter:  11

6 U.S. AMERICAN STONE AND MINERALS,   No.  2-07-01628-GBN
  INC.,

7

        Debtor.

8

_____/

9

10

11

12

        --o0o--

13

     Rule 2004 Examination of

14

        BUD D. KLEIN

15

      February 29, 2008

16

        --o0o--

17

18

19

20    Reported by:   DEBRA P. CODIGA, CSR No.  5647

21

22

23

24

25

1          And John Owen was supposed to have other people

2    coming up with capital to help the company, other

3    investors, and he had a bank and lots of things.

4          Nothing ever matured, that I know of.

5    Q.    Mr. Owen told you about these other investors

6    and this bank; is that correct?

7    A.    Yes.

8    Q.    Mr. Klein, did you ask anybody to prepare the

9    first two pages of this document for you?

10   A.    No.

11   Q.    So this was just sent to you --

12   A.    That's correct.

13   Q.    -- correct?

14         Looking down that first page, you'll see there

15   is -- I think it's the last complete paragraph. It

16   starts, "The depositor of the $10 million will retain

17   $40 million of working interest in the five mines owned

18   by USAR."

19         Do you see that, sir?

20   A.    I'm seeing it.

21   Q.    What was your understanding of what a "working

22   interest" is?

23   A.    Never could understand, but it wasn't stock.

24   It was working interest of -- that was one of my blocks

25   too.  I didn't -- not being in the mining business or

1    anything like that, I never understood what "working

2    interest" really was.

3        Q.    Did you think it was like a loan?

4        A.    In my case, it was a loan, written as a loan.

5        Q.    Did you understand -- when I think of the term

6    "working interest," I think of a percentage interest in

7    profits.

8              Is that --

9        A.    That could be one --

10        Q.    -- your understanding?

11        A.    -- way to look at it, but it could be other

12    things too.  I don't know what -- there was no specifics

13    tied to it.

14        Q.    So you really didn't understand what "working

15    interest" meant in all of these documents?

16        A.    I asked to have it explained, yes.

17        Q.    And how was it explained to you, sir?

18        A.    That it -- they couldn't issue stock, but they

19    could issue working interest.

20        Q.    And were you told that working interests were

21    the equivalent of stock?

22        A.    No.  They couldn't issue stock.  So if they

23    couldn't issue stocks, why would they use that

24    verbiage?  I mean --

25        Q.    Were you told why they couldn't issue stock?

1    A.    No.  Something to do with the -- the company.

2    Q.    You mentioned your initials --

3    A.    If it was working interest, they never showed a

4    percentage of anything, that I can recall.

5    Q.    When you say "showed a percentage," what --

6    A.    What I --

7    Q.    -- do you mean by that, sir?

8    A.    What I meant, I mean what working -- what the

9    word "working interest" meant.  It didn't mean stock.

10   What did it mean?

11   Q.    You said your initial -- these -- these

12   initials, NB, meant note to Bud --

13   A.    Yes.

14   Q.    -- correct?

15         When you made -- why would you make that

16   initial at any particular part of the document?

17   A.    So I could go back and read it if it was

18   important.  If I had to read these between 12 o'clock at

19   night and six o'clock the next morning, no way.

20   Q.    You'd make a few notes to come back and read

21   it?

22   A.    It would take me several months to understand

23   that document thoroughly, and I hadn't hired any

24   attorney to read it, which would have been very

25   expensive.