Anthony W. Clark, Arizona Bar #:018279
Anthony W. Clark and Associates, PLLC
PO Box 34506
Phoenix, Arizona 85067
ecf@awcesq.com
Telephone: (602) 266-9596
Facsimile: (602) 266-6774

Attorney for The Gerald Blank Trust,
Rachel Blank, Successor Trustee

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| In re: | Case No.: 07-01628-ECF-GBN |
|---|---|
| U.S. AMERICAN STONE AND MINERALS, INC., | Chapter 7 |
| Debtor. | **MOTION AND APPLICATION FOR RULE 2004 EXAMINATION AND PRODUCTION OF DOCUMENTS** |

The Gerald Blank Trust (Blank Trust) through the Law Office of Anthony W. Clark and Associates, PLLC, hereby moves this Court for an Order directing debtor to produce documents for inspection and copying at the law offices of Anthony W. Clark and Associates, PLLC, physically located at 1990 West Camelback, Suite 207, Phoenix, Arizona 85015 (or by verified mailing to the above Post Office Box) on or before **May 21, 2010**. Further, Blank Trust also applies for an order directing debtor to submit to oral examination at the physical address last mentioned **after May 25, 2010 and before May 31, 2010**.

A Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code was filed by the Debtor on February 27, 2007,

which was converted to Chapter 7 on April 23, 2010.  Blank Trust commenced Adversary Case No. 2:07-ap-00293 on May 11, 2007 seeking declaratory relief and temporary and permanent injunctive relief as to collection of certain invoices issued by, and turnover of certain funds held by, the debtor and/or related Defendants in the subject adversary, rescission of contract and damages for securities fraud and fraud and misrepresentation, including attorneys fees and costs.

    Blank Trust desires to examine the Debtor regarding its financial affairs since its incorporation until, and after, the commencement of the present bankruptcy case, and its conduct with reference to Blank Trust.

    Pursuant to Rule 2004, Rules of Bankruptcy Procedure, upon motion of any party in interest, the court may order the examination of any person relating to the acts, conduct or property, or to the liabilities or financial condition of the debtor, or relating to any matter which may affect the administration of debtor's estate.

    Blank Trust requests that Robert Palmer (Debtor's President) and James G. Somma (Debtor's Chief Financial Officer) be ordered to submit to oral examination on **May 28, 2010 at 9:00 a.m. and 1:00 p.m. (respectively)** at the law offices of Anthony W. Clark and Associates, PLLC at 1990 West Camelback, Suite 207, Phoenix, Arizona 85015, and to produce, prior to examination, the materials and documents as defined and requested in the **ATTACHMENT** noted below and attached hereto. The oral examination

-2-
Case 2:07-bk-01628-GBN    Doc 499    Filed 05/11/10    Entered 05/11/10 23:10:25    Desc
Main Document    Page 2 of 20

of Robert Palmer will begin promptly at **9:00 a.m.**, and will be followed by the oral examination of James G. Somma at **1:00 p.m.**

WHEREFORE, Blank Trust prays that this Court enter an order requiring the above-named persons and entity to appear for a Bankruptcy Rule 2004 examination at the specified time and place and that they be required to produce all items described herein and listed in the **ATTACHMENT** affixed hereto.

Dated: May 11, 2010   ANTHONY W. CLARK & ASSOCIATES, PLLC

/s/Anthony W. Clark_____
By: Anthony W. Clark

CERTIFICATE OF SERVICE

I, Anthony W. Clark, hereby certify that a true and correct copy of the foregoing has been delivered by electronic mail, facsimile and or by first class regular mail, postage prepaid this May 11, 2010 as follows:

**Christopher H. Bayley**
Eric S. Pezold
Evans O'Brien
Lori A. Lewis
Andrew Harnisch
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202

**ARTHUR I. UNGERMAN**
ONE GLEN LAKES TOWER
8140 WALNUT HILL LN, NO.301
DALLAS, TX 75231

| | |
|---|---|
| 1 | **JOYCE W. LINDAUER** |
| 2 | JOYCE W. LINDAUER, ATTORNEY AT LAW |
|   | 8140 WALNUT HILL LANE, SUITE 301 |
| 3 | DALLAS, TX 75231 |
| 4 | **NICHOLAS CHRISTIAN INMAN** |
|   | 8140 WALNUT HILL LN, STE 301 |
| 5 | DALLAS, TX 75231 |
| 6 | |
|   | **ADAM B. NACH** |
| 7 | LANE & NACH, P.C. |
|   | 2025 NORTH THIRD STREET, SUITE 157 |
| 8 | PHOENIX, AZ 85004 |
| 9 | **James G. Somma** |
|   | 1000 E. Ash Lane #1703 |
| 10 | Euless, TX 76039 |

                                    /s/ Anthony W. Clark
                                    Anthony W. Clark

**ATTACHMENT**

As used herein, the following terms shall have the meanings set forth hereinafter.

"and or" shall mean and be construed to call for the broadest inclusive response and shall not be construed to limit the scope of the request or response thereto in any manner.

"USASM" shall mean Debtor U.S. AMERICAN STONE AND MINERALS, INC. including its officers, directors, employees, agents and servants, other than attorneys with whom communication is alleged to be privileged.

"Plaintiff" and "Blank Trust" shall mean The Gerald Blank Trust and Gerald Blank individually and as Trustee of the Gerald Blank Trust, collectively, including employees, agents, servants and assigns.

"Defendant" shall mean any named Defendant named in Adversary Case No. 2:07-ap-00293 and "Defendants" shall mean all named Defendants in said action, unless otherwise specifically limited or denominated.

"USAR" shall mean U.S. AMERICAN RESOURCES, INC. including its officers, directors, employees, agents and servants, other than attorneys with whom communication is alleged to be privileged.

"IER" shall mean INTERNATIONAL ENERGY AND RESOURCES, INC. including its officers, directors, employees, agents and servants, other than attorneys with whom communication is alleged to be privileged.

"PALMER" shall mean ROBERT PALMER.
"BROWN" shall mean DON E. BROWN.
"HANCOCK" shall mean DON HANCOCK.
"CLARK" shall mean R. DAVID CLARK.
"OWEN" shall mean JOHN D. OWEN.

"You" and "Your" shall mean and refer to USASM, Robert Palmer and James Somma, collectively for purposes of producing documents requested hereunder.

"Participant" shall mean each and every investor, individual, person, incorporated entity, limited liability company, partnership, estate, trust, joint venture or other actor or being (whether corporeal or incorporeal) who paid, transferred, conveyed, gave, delivered or relinquished anything of value in exchange for the purchase, acquisition, assignment, conveyance, pledge or grant of any right, interest, position, equity, share, stake, stock or expectancy in any enterprise, venture, joint venture, opportunity, investment, undertaking, offering, partnership, project, cooperative or entity that was offered, created, incorporated, formed, promoted, represented, operated, maintained, managed, sold or held by USASM, USAR, IER,

OWEN, PALMER, BROWN, CLARK and or HANCOCK during the period 1/1/2001 through 12/1/2008 (Blank Trust is included in this definition of "participant").

"Correspondence" shall mean any and all recorded communication to or from the referenced person(s), including written letters, electronic mail, facsimile, audio, video, digital, stenographic and other recordings and documents.

"Document" shall mean any kind of printed, recorded, written, graphic, or photographic matter (including tape recordings), however printed, produced, reproduced, coded or stored, of any kind of description, whether sent or received, or not, including originals, copies, reproductions, facsimiles, drafts, and both sides thereof, and including without limitation, papers, books, accounts, ledgers, journals, books or memoranda, telegrams, cables, e-mails, wire transfers, notes, notations, work papers, inter and intraoffice communications to, between, or among directors, or other conversations or of interviews or of conferences, or of committee meetings, or of other meetings, agreements, contracts, invoices, statistical records, data sheets, computer tapes or disks, magnetic tapes, punch cards, computer printouts, computer programs, computer program coding sheets, microfilms, microfiche, all other records kept by electronic, photographic, or mechanical means, and anything similar to any of the foregoing, regardless of their author or origin, of any kind.

**INSTRUCTIONS**

To the extent any request seeks production of an electronic record, file, electronic mail or other digitally recorded material not readily available in hard-copy (paper), you are directed to produce same in an uncompressed, unencrypted, digitally encoded record in CD (compact disk) format and if such material is password-protected, you are directed to provide the highest level password permitting unlimited access to such material in its reproduced form.

Furnish all requested documents known or available to you regardless of whether such documents are possessed directly by you, your agents, employees, representatives, investigators, or attorneys or their agents, employees, representatives or investigators and regardless of whether the documents were generated by you or on your behalf.

To the extent you regard any request excessively broad or vague in any aspect and or to the extent any request calls for one or more documents relating to a period of time for which you possess or have knowledge of only a part but not the entire period referenced, you are directed to produce or make available for copying and inspection that portion of the document(s) requested presently in your possession and otherwise you are

directed to provide, if known, the identity (first and last name), complete mailing address(es) and telephone number(s) of the possessor(s) of the balance of such document(s) and or that of those who may have knowledge of its whereabouts.

To the extent you contend production of any one or more of the requested document(s) would or might compromise the privacy, security, integrity, standing or reputation of any person or entity or risk disclosure or dissemination of any proprietary or other information deserving or warranting confidentiality or other protection from disclosure, you are directed to redact that portion of any document(s) posing such a risk, state in the responses hereto that redaction has been made and the reasons for same and produce for copying and inspection the balance of the requested document(s) as redacted or, alternatively, proffer, within seven (7) days before the date when responses to these requests are due, a proposed Stipulated Protective Order and Confidentiality Agreement limiting the reproduction, dissemination and publication of the un-redacted subject document(s).

If any documents or things requested were at one time in existence but are no longer in existence, so state, specifying for each such document: (1) the type of document; (2) the type of information contained in it; (3) the date upon which it ceased to exist; (4) the circumstances under which it ceased to exist; (5) the identity of all persons having knowledge of the circumstances under which it ceased to exist; and (6) the identity of all persons having knowledge of who had knowledge of the contents of it.

In the event you are unable to produce or make one or more of the documents requested available for copying and inspection, you are directed to set forth the reason(s) for such inability and, if known, the identity (first and last name), complete mailing address(es) and telephone number(s) of the possessors of such document(s) and or the identities of those who may have knowledge of its whereabouts.

**DOCUMENTS REQUESTED**

1) A true and correct copy of any and all written agreement(s) and or contract(s) (executed in hand-writing or otherwise) between Plaintiff and any and or all Defendant(s) along with any and or all cancellation(s) thereof, amendment(s) and any and or all addendum(s) thereto.

2) Any and all documentary evidence of payment(s) originating from or issued by any and or all Defendant(s) at any time (whether in the form of hard currency, by written instrument including personal check, company check, cashier's check or

money order and or by electronic funds transfer) made, paid, conveyed, delivered or transferred to or for the benefit of the Plaintiff.

3) The loan application, financial statement and or other solicitation and or correspondence submitted to Vineyard Office Plaza, LLC (its agent, attorney or representative) in connection with the purchase of the Vineyard Tract at the Congress Mine in Yavapai County, Arizona, which is the subject of the Motion for Relief from the Automatic Stay (Docket Entry #6) filed in this matter, including supporting documents.

4) The loan application, financial statement and or other solicitation and or correspondence submitted to Rock Bottom, LLC (its agent, attorney or representative) in support of any and or all efforts to obtain Debtor-In-Possession financing for USASM, including supporting documents.

5) The lease and or leases (and any and or all renewals and addendums thereto) that established any Defendant's possession of the premises located at 3839 Briargrove Lane, Dallas, Texas.

6) The lease and or leases (and any and or all renewals and addendums thereto) that established any Defendant's possession of the premises located at 6263 North Scottsdale Road, Suite 145, Scottsdale, Arizona 85250.

7) The lease and or leases (and any and or all renewals and addendums thereto) that established any Defendant's possession of the premises in Plano, Texas referenced in HANCOCK's March 9, 2010 deposition (see Exhibit A).

8) The storage lease agreement and or contract (and any and or all renewals and addendums thereto) between any and or all Defendant(s) and any and or all storage facilities where property belonging to IER, USAR and or USASM has been stored during the period 1/1/2001 through the present.

9) Articles of incorporation, Bylaws and Amendments thereto, Resolutions and Minutes of shareholder and board(s) of directors meetings for USAR, USASM and IER for the period 1/1/2001 through 4/1/2007.

10) Stock certificates issued in connection with USAR's acquisition of and or ownership of corporate shares of USASM.

11) Stock certificates issued in connection with OWEN's acquisition of or ownership of corporate shares of USAR.

12) Federal Tax Returns (including payroll tax returns) filed by IER for each year from date of incorporation until IER was sold to the "man in Spain" as referenced in OWEN's March 8, 2010 deposition (see Exhibit B).

13) Federal Tax Returns (including payroll tax returns) filed by USAR and USASM since their incorporation.

14) OWEN's Federal Income Tax Returns for 2001, 2002, 2003, 2004, 2005, 2006 and 2007.

15) Correspondence between the Plaintiff and any and or all Defendants during the period between 7/1/2005 and 12/31/2008.

16) Correspondence between any and or all Defendant(s) and any and or all participant(s) during the period between 7/1/2005 and 4/30/2007.

17) Telephone billing records for all land lines and cellular telephone accounts reflecting itemized long-distance calls and charges made or incurred by IER during the period between 7/1/2005 and 12/1/2005 and those for USAR and USASM for the period between 7/1/2006 and 4/1/2007.

18) Telephone billing records for all land lines and cellular telephone accounts reflecting itemized long-distance calls and charges made or incurred by OWEN during the period between 7/1/2005 and 12/1/2005 and between 7/1/2006 and 4/1/2007.

19) A true and correct copy of each issue or version of the "book" mailed to "leads" referenced in HANCOCK's March 9, 2010 deposition (see Exhibit A), including those mailed before, during and after his employment at IER.

20) The EML or list of the electronic mail addresses of each "participant" in Chastain Mine Joint Venture I.

21) The Purchase/Sale agreement regarding the sale of IER to the "man in Spain" as referenced in OWEN's March 8, 2010 deposition (see Exhibit B) and evidence of the payment received (check payable or bank statement reflecting deposit of funds in whatever form).

22) The Quickbooks (or other electronic accounting software) company file reflecting IER's financial operations and records during the period 1/1/2001 through 6/1/2001 and 6/1/2005 through the date shares in IER were sold to the "man in Spain" as referenced in OWEN's March 8, 2010 deposition (see Exhibit B).

23) Monthly statements for all deposit, investment and merchant accounts held by IER for the period 1/1/2001 through 6/1/2001 and 6/1/2005 through the date shares in IER were sold to the "man in Spain" as referenced in OWEN's March 8, 2010 deposition (see Exhibit B).

24) The Quickbooks (or other electronic accounting software) company file reflecting USAR's financial operations and records during the period 12/1/2004 through 3/1/2005, 7/1/2005 through 11/1/2005 and 6/1/2006 through 3/1/2010.

25) Monthly statements for all deposit, investment and merchant accounts held by USAR for the period 12/1/2004 through 3/1/2005, 7/1/2005 through 11/1/2005 and 6/1/2006 through 3/1/2010.

26) The Quickbooks (or other electronic accounting software) company file reflecting USASM's financial operations and records during the period beginning with incorporation through April 1, 2007.

27) Monthly statements for all deposit, investment and merchant accounts held by USASM for the period beginning with incorporation through April 1, 2007.

28) Any and all contracts between Global Timber and Resources, Incorporated and any and all Defendants.

29) The participant agreement between IER and HANCOCK.

30) The lend/lease/rental agreement between USASM and any Defendant for USASM's use of equipment owned or leased by any and all Defendants.

31) Notes payable, financing or loan agreements between any of the Defendants.

32) A true, correct and complete copy of the document evidenced by Exhibit C, purportedly issued by IER.

33) Articles of incorporation, Limited Liability Company formation, partnership, trust or other evidence of formation of the IER Foundation as referenced in Exhibit D.

34) A true and correct copy of the lease of "screening plant" as referenced in Exhibit D.

35) Any and all documentary evidence that Plaintiff breached any obligation or duty owed due any Defendant and or evidence of any act, omission, statement or other conduct on the part of the Plaintiff that in any way harmed or brought damages or loss of any kind to any Defendant at any time.

# EXHIBIT A

Page 5

1  P R O C E E D I N G S
2  DON HANCOCK,
3  having been first duly sworn testified as follows:
4  EXAMINATION
5  BY MR. CLARK:
6  Q. Mr. Hancock, please state your name.
7  A. Don Hancock.
8  Q. Have you had your deposition taken before?
9  A. No.
10 Q. Well, you should know that you need to give
11 verbal answers like a verbal yes or no or whatever
12 because the court reporter cannot take down other than
13 words that you speak.
14      Are you under the influence of anything
15 that might prevent you from giving me your full
16 attention and complete and truthful answers today?
17 A. No.
18 Q. Your hearing is good, your eyesight is good,
19 you'll be able to look at documents; is that right?
20 A. Yes.
21 Q. If you don't understand a question, will you
22 ask me to clarify it for you?
23 A. Yes.
24 Q. If you need a break, you'll ask me to stop?
25 A. Yes.

Page 6

1  Q. What's your address?
2  A. 4592 Shamrock Drive, Frisco, Texas, 75034.
3  Q. And how long have you lived there?
4  A. Nine years. Wow.
5  Q. And is that your -- is that where you get
6  mail as well?
7  A. Correct.
8  Q. Did you ever work for U.S. American
9  Resources?
10 A. I worked for IER.
11 Q. For International Energy and Resources --
12 A. Yes.
13 Q. -- Incorporated?
14 A. Yes.
15 Q. Okay. And when was it that you worked for
16 them?
17 A. Approximately seven years ago, six years ago.
18 Q. Okay. From when until when would you say?
19 A. I don't recall the exact dates.
20     THE WITNESS: Do I need to wait until
21 he's here?
22     THE REPORTER: No.
23 A. My answer: I don't recall the exact dates.
24 It was approximately two -- two years.
25 Q. (BY MR. CLARK) About two years?

Page 7

1  A. Yeah.
2  Q. What -- what did you do for them?
3  A. I was the VP of sales.
4  Q. Say again.
5  A. VP of sales.
6  Q. Who was the president of sales?
7  A. Don Brown, to the best of my knowledge.
8  Q. Was there more than one president of sales?
9  A. Not to my knowledge.
10 Q. So as vice president of sales, what did you
11 do?
12 A. Basically support.
13 Q. Describe that for me.
14 A. Answer questions, help any of the -- the
15 sales guys that had questions. That was generally
16 what I did is just provide support. If questions came
17 up, try to provide the answer, find the answer if I
18 didn't have it.
19 Q. So you would support other salespersons?
20 A. Correct.
21 Q. And where was this activity conducted, your
22 support activities?
23 A. I supported the in and out of the office.
24 There was many sales guys I supported, whenever they
25 needed me.

Page 8

1  Q. Where was the office?
2  A. At Plano. I don't recall the exact address.
3  Q. Did you ever work out at Briargrove?
4  A. Possibly. I really can't remember if that
5  was absolutely the name.
6  Q. IER's offices were located where at that
7  time?
8  A. In Plano, I believe, in a complex. Again, I
9  don't recall the name. I believe that -- that may
10 have been it.
11 Q. So other than answering questions from
12 salespeople employed by IER, did you have any other
13 role at IER?
14 A. Answering participant questions.
15 Q. And who are participants?
16 A. That would be someone who chose to come in
17 and invest in the project.
18 Q. Okay. What project are you referring to?
19 A. I'm referring to the -- the primary project
20 out in the mining operation.
21 Q. Where was the mining operation?
22 A. Arizona.
23 Q. What kind of mining was it?
24 A. Precious metals.
25 Q. Okay. So you answered questions for

2 (Pages 5 to 8)

Page 25

1  A. Yes.
2  Q. And what would be the -- what would be the
3 occasion or the circumstance that would trigger a
4 bonus?
5  A. It was a structure set up in place that there
6 were several triggers, if you will, for bonuses. It
7 depended on how many books we would get out, which was
8 information to interested party. I could receive a
9 bonus on overall production from, you know, all the
10 sales guys. Those are primarily what I recall getting
11 them from.
12  Q. Okay.
13  A. You know, performance-based.
14  Q. Performance -- what was the objective of the
15 work? What were they attempting to do? What was the
16 goal?
17  A. Well, I mean, I had a lot of goals with the
18 company and personal goals. I consider myself a very
19 integrity-driven individual, and I spent a lot of time
20 making sure that these -- these people knew and --
21 knew what they were doing and knew what they were
22 talking about and could make sure -- if I saw
23 problems, for example, with their clients. So any
24 time we would move forward without complaints and if I
25 would speak to the participants and they told me they

Page 26

1 were satisfied with the information, they were happy,
2 that would be considered a good performance. You
3 know, the amount of books that we would get out that
4 would be requested from us --
5  Q. Okay.
6  A. -- could trigger a bonus.
7  Q. So you got bonuses based on how many books
8 you mailed out?
9  A. Yeah, that was one, absolutely.
10  Q. Where did the books come from?
11  A. Mr. Brown would provide them to us.
12  Q. Okay.
13  A. If that's what you mean.
14  Q. So then the goal -- the goal of the operation
15 was to mail out books?
16  A. Well, if you don't know about a project, it's
17 hard to invest in it, so yeah.
18  Q. What was the goal of the project, I guess?
19  A. Well, people would request information on the
20 project. They would request a book. We would send a
21 book out. So based on their interest, they would then
22 chose to return our call or call us back with
23 additional interest or not. So yeah, the first level,
24 if you will, is find somebody who is interested, you
25 know.

Page 27

1  Q. Interested in --
2  A. In investments, you know, in looking at
3 precious metal in this particular arena.
4  Q. So then the -- your testimony, I think --
5 because this is what I'm hearing, is the goal of the
6 operation, the function of this operation at IER was
7 to mail out books and inform people about
8 opportunities in investment in precious metals?
9  A. Which ultimately could lead to an investment
10 into the project.
11  Q. An investment in terms of what?
12  A. Investing.
13  Q. Money?
14  A. Yeah, an investment of money into the project
15 based on their understanding via the book.
16  Q. The way you invested?
17  A. Yeah.
18  Q. The same way?
19  A. Correct.
20  Q. Okay.
21  A. Via the sales representatives, via my input
22 in answering questions. We were very thorough before
23 anybody came in as to -- you know, they were even
24 welcome to come out to the mine and look at the
25 project and speak to geologists, as my family was and

Page 28

1 as everybody I talked to was.
2  Q. Did your family go out to the mine?
3  A. I did. No, I don't think I had any family
4 members -- I did have family members come in and meet
5 with Mr. Brown. Look, my character speaks for itself
6 with my family. They trust me and, again, I wouldn't
7 speak to anybody unless I'd invested myself and
8 understood the project, so I felt we were very
9 competent in making sure we had everything on the
10 table before someone could make a decision.
11  Q. So your family has invested $37,000 or so?
12  A. No. I have another uncle who has got another
13 25, could be even 50. But at least 25. Do I have an
14 aunt? I may have an aunt and uncle with another 25.
15 I think there is a total of seven family members and
16 friends, very close, dear friends of mine.
17  Q. Do they live here in Dallas?
18  A. No. They're spread out.
19  Q. Okay.
20  A. This is the most substantial investment I
21 made, so it'll give you an idea of what my belief
22 level was in the project.
23  Q. So while you have other investments, this was
24 the most substantial investment that you made?
25  A. Absolutely.

7 (Pages 25 to 28)

# EXHIBIT B

Page 9

1 A. The board elected me as a director.
2 Q. Who are the other board members?
3 A. Robert Palmer, David Clark, Jim Somma, and I
4 think Bill Gunter.
5 Q. Did you cause the incorporation of USAR?
6 A. Yes.
7 Q. And USAR owns a hundred percent of USASM?
8 A. Yes, but the stock for that company is
9 pledged to somebody else.
10 Q. The stock for what company?
11 A. For US -- American -- let me turn this off.
12 For U.S. American --
13 Q. Pledge to whom?
14 A. A lawyer and a creditor.
15 Q. Who is the lawyer?
16 A. Joyce Lindauer.
17 Q. So USAR owns a hundred percent of USASM?
18 A. Correct.
19 Q. All right. But you don't know who
20 incorporated it?
21 A. I don't remember.
22 Q. Do you own any stock in USASM?
23 A. No, I guess not, if USAR owns a hundred
24 percent of it.
25 Q. All right. Do you own any stock in USAR?

Page 10

1 A. Yes.
2 Q. How much?
3 A. 80 percent.
4 Q. Who owns the other 20 percent?
5 A. There are --
6 Q. Why don't we table that and we'll figure that
7 out --
8 A. Well, I'll tell you. There's four other
9 ones, four other people.
10 Q. There are four other shareholders in USAR,
11 right?
12 A. Correct.
13 Q. Who are they?
14 A. Jim Somma.
15 Q. Uh-huh.
16 A. David Clark.
17 Q. Uh-huh.
18 A. And my father.
19 Q. Alfred?
20 A. Yes.
21 Q. Alfred. Alfred still alive?
22 A. Yes, he is.
23 Q. Is he in North Carolina?
24 A. No.
25 Q. Where is he?

Page 11

1 A. He's in Frisco, Texas.
2 Q. Frisco?
3 A. Frisco, Texas.
4 Q. Where were you born?
5 A. New York.
6 Q. Long island?
7 A. Yes.
8 Q. How did you get to Texas?
9 A. My mother's family is from Texas. I went to
10 college here.
11 Q. Okay. All right. Who owns IER? A man in
12 Spain?
13 A. Yes.
14 Q. Have you ever been to Spain?
15 A. Yes.
16 Q. Do you hold a passport?
17 A. Yes.
18 Q. Have you traveled outside the U.S. in the
19 past five years?
20 A. Yes.
21 Q. Where?
22 A. Spain.
23 Q. Anywhere else?
24 A. No.
25 Q. What was the purpose of your trip to Spain?

Page 12

1 A. My godchild was being baptized. I went there
2 for the baptism.
3 Q. What's the man's name in Spain who owns IER?
4 A. Harold -- I can't pronounce his last name.
5 It's Cacone or something like that.
6 Q. Okay. How did he come to own it?
7 A. We sold it to him.
8 Q. How much did he pay you for it?
9 A. I don't recall.
10 Q. Well, was it -- was it -- I'm trying not to
11 ask you to speculate, but was it more than a million?
12 A. No.
13 Q. Was it more than 500,000?
14 A. No.
15 Q. Was it more than a hundred thousand?
16 A. I don't believe so, but I don't remember.
17 Q. Was it -- okay. So then it was the -- you
18 think it was less than a hundred thousand. Did he
19 actually pay you money?
20 A. Yeah, I believe he did, yes. Not me but paid
21 the company that owned it.
22 Q. And who was that?
23 A. I believe at that time -- I'm not -- I think,
24 but I'm not sure, that it was -- no, I don't want to
25 say because I don't really remember.

3 (Pages 9 to 12)

Page 73

1 A. No.
2 Q. Did he acquire any working interests or
3 other --
4 A. I don't know if he had working interest or
5 not.
6 Q. If USASM were to assign or convey a working
7 interest, would the board of directors need to approve
8 that transaction?
9 MR. REAVES: Can I ask a question,
10 Anthony? What do you mean by working interest?
11 MR. CLARK: Well, I'll let Mr. Owen
12 explain that.
13 MR. REAVES: Mr. Owen, do you understand
14 what he means by working interest?
15 THE WITNESS: Yeah, I know what working
16 interest is, but I don't think he understands how it
17 worked. So I'll just let everybody know how it
18 worked. Working interest was sold to joint venturers.
19 People owned a percentage of the joint venture and
20 that's how it worked.
21 Q. (BY MR. CLARK) Was any working interest in
22 USASM ever conveyed to anyone under any circumstances?
23 A. No.
24 Q. USAR?
25 A. Did USAR convey working interest?

Page 74

1 Q. Uh-huh.
2 A. To joint ventures.
3 Q. As collateral for a loan ever?
4 A. I don't -- as collateral, I don't know if
5 they did that for collateral -- as collateral. I
6 don't know. I don't think so.
7 Q. Okay. Mr. Palmer, was he ever a joint
8 venturer with you in any -- well, with IER?
9 A. Was he ever a participant?
10 Q. Um-hmm.
11 A. I don't know.
12 Q. Was he ever an investor?
13 A. I don't know that either. I don't recall.
14 Q. So in IER you were CEO in 2005?
15 A. Yes.
16 Q. When an interest in a joint venture was
17 conveyed or assigned, would that have been something
18 that would have required approval by the board of
19 directors?
20 A. When an interest was what?
21 Q. Conveyed, sold, transferred.
22 A. What -- what kind of interest are you talking
23 about? Are you talking about the joint venture?
24 Q. Yeah.
25 A. Part of a joint venture?

Page 75

1 Q. Right.
2 A. So if someone participated in the joint
3 venture would it have required a board of director's
4 approval?
5 Q. Right.
6 A. No.
7 Q. Did Mr. Palmer ever get any bonuses?
8 A. I don't know.
9 Q. To whom did he answer? Who was his superior
10 at IER?
11 A. Probably Don Brown.
12 Q. And to whom did Mr. Brown answer?
13 A. He really didn't answer to anybody. He --
14 him and I talked frequently, but I don't believe -- he
15 really didn't have to answer to anybody. Discussed
16 stuff with me, but really I didn't look at it as
17 answering to anyone.
18 Q. Would you not have been his boss?
19 A. Yeah, I could have -- I guess you could say I
20 was his boss, but I was -- he was also a partner,
21 so...
22 Q. He was a partner?
23 A. At the time, yeah -- at a period of time,
24 yeah.
25 Q. So Mr. Brown was a partner at some point?

Page 76

1 A. In IER, yes.
2 Q. And how did he obtain that status as partner?
3 A. He was just brought in as a partner sometime
4 in 2001 or '2, I believe.
5 Q. Did he pay something to become a partner
6 or...
7 A. I don't think so.
8 Q. You don't think so?
9 MR. REAVES: Can I clarify something too?
10 I mean, we're talking about a corporate entity here, I
11 believe, IER; is that correct? So I mean --
12 THE WITNESS: Yes.
13 MR. REAVES: -- partnerships, they would
14 have shareholders.
15 THE WITNESS: Yeah, it's a corporation.
16 It's incorporated.
17 Q. (BY MR. CLARK) So did Mr. Brown ever come to
18 own any shares in IER?
19 A. Yes.
20 Q. But at this point the Spaniard owns a hundred
21 percent of the shares in IER?
22 A. I don't know if he's a Spaniard.
23 Q. The man in Spain?
24 A. The man in Spain, yes.
25 Q. Okay. Other than -- do you know what

19 (Pages 73 to 76)

# EXHIBIT C

## Introducing, IER's Star Property...

# The Chastain Mine

- **.20** ounces of **gold** per ton average
- Assays as high as **2.21** ounces per ton
- Reserves at **$400 million +**
- **Mother Lode** type vein structures
- **Gold** visible to the naked eye
- **Environmentally safe technology** used to recover gold from ore

**IER** is a technology-driven company dedicated to helping reclaim the environment, and to developing environmentally safe technology focused on the recovery of precious metals. Our team of expert managers, geologists, mining engineers, precious metal chemists, and environmentalists work together with integrity and skill to discover and recover precious metals.

# EXHIBIT D

# International Energy and Resources, Inc.

## Our Focus for 2004

- Consultant, Shield Environmental Associates, Inc. (SEAI) (See IER Team) will direct IER in development at the Chastain Mine as well as reclamation of previous disturbances made at the Chastain property prior to IER's involvement.

- IER will donate up to 10% of income from the Chastain Mine to the IER Foundation (see IER Foundation). One of the main focuses of the foundation will be reclamation on locations designated by the BLM (Bureau of Land Management). SEAI will hire and oversee contract work and operations for all reclamation.

- IER will continue to develop a safe alternative to cyanide leaching. This proprietary technology is 20 years in the making, and is likely to revolutionize the recovery of precious metals. IER will utilize this technology to process ore from the Chastain Mine.

- IER has leased a screening plant geared to produce 18,000 tons of gravel in 2004, as well as various other rock products. The Chastain Mine is in a prime location to participate in the reported $1.8 billion annual rock products industry (according to 2003 figures of the Arizona Rock Products Association).

*WE are extremely excited about the progress made in 2003.*
*We look forward to great development in 2004 & the next decade!*

John Owen, Founder & CEO and Don Brown, President